UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARWA BADR,

                                 **24-cv-05333 (JMA)(JMW)**

             Plaintiff,

v.

NEW YORK INSTITUTE OF TECHNOLOGY,
NYIT-COM COLLEGE OF OSTEOPATHIC
MEDICINE,

             Defendant.
----------------------------------------------------------X

## CORRECTED AMENDED COMPLAINT AND JURY DEMAND

    Plaintiff MARWA BADR, by and through her undersigned counsel, sues the defendant NEW YORK INSTITUTE OF TECHNOLOGY NYIT-COM COLLEGE OF OSTEOPATHIC MEDICINE., and in support thereof, alleges as follows:

### NATURE OF THE ACTION

1.     This action is brought to remedy discrimination on the basis of national origin and religious discrimination pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), et seq. ("Title VI") and any other cause(s) of action that can be inferred from the facts set forth herein.

2.     Defendants have a duty not to engage in invidious discrimination practices that discourage enrollment or involvement based on religion or national origin. As hereinafter shown, Plaintiff, as a practicing Muslim Egyptian American, is a member of a protected class and beneficiary of this non-discrimination mandate.

3.     As further shown herein, Defendant has breached their duty of non-discrimination, resulting in her dismissal from the Defendant New York Institute of Technology, College of Osteopathic Medicine.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Title VI, 42 U.S.C. §2000(d), et seq.

5.     The venue is proper in the Defendant maintains its offices within the Eastern District of New York and the claims asserted herein arose within the district.

**THE PARTIES**

6.      At all times material hereto, Plaintiff Marwa Badr (also known as Sarah Adams and hereinafter "Plaintiff") is a Mineola, New York resident. She is Muslim and originally from Egypt. Defendant perceived Plaintiff's shared ancestry and ethnic characteristics from Egypt, where Islam is the dominant religion or distinct religious identity as intertwined.

7.      At all times material hereto, defendant New York Institute of Technology, College of Osteopathic Medicine, thereafter (hereinafter "NYIT-COM") is a corporation entity existing by virtue of the laws of the State of New York and conducts a significant amount of business in the State of New York, with its principal offices in the State of New York.

8.      Defendant is a recipient of federal, state, and local government grants, loans, etc., and is within the jurisdiction of this Court.

**FACTUAL STATEMENT**

9.     Plaintiff MARWA BADR (a/k/a Sarah Adam) was a fourth-year medical student at NYIT-COM College of Osteopathic Medicine (hereinafter "NYIT-COM").

10.    Due to discriminatory practices against her, Plaintiff was unable to graduate and obtain her degree even though she completed almost all the required NYIT-COM curriculum.

11.    Plaintiff is a Muslim student of Middle Eastern descent (Egypt). Defendant perceived Plaintiff's shared ancestry and ethnic characteristics from Egypt, where Islam is the dominant

religion or distinct religious identity as intertwined.

12.    The Plaintiff is a member of NYIT-COM's class of 2022 and a student of the Émigré Physicians Program (EPP) at NYIT-COM, a unique initiative designed to retrain internationally educated doctors as a Doctor of Osteopathic Medicine (D.O.) in residency training. In 2018, Plaintiff enrolled in the Emigre Physicians program (EPP) at NYIT-COM, a unique program that enrolls 38 international medical graduates.

13.    Over the course of four years, Plaintiff fulfilled all graduation requirements and was just two months away from completing her degree before her expulsion in March of 2022.

14.    On March 22, 2022, Plaintiff was dismissed from NYIT-COM after completing 4 years of medical graduation requirements. In the Defendant's final termination letter, NYIT-COM stated they expelled Dr. Badr for two clinical incidents.

15.    Coming from a medical family with both parents as doctors, Plaintiff devoted her entire life to medicine.

16.    Plaintiff completed seven years of medical school in Egypt with honors, followed by four years of obstetrics and gynecology residency training in Egypt, during which Plaintiff performed approximately 5000 vaginal deliveries and 600 cesarean sections and other gynecologic surgeries and fifteen scientific publications in women's reproductive health.

17.    Upon immigrating to the United States of America, Plaintiff volunteered as a clinical research fellow and shadowed in the clinics for four years from 2011 to 2015 at Augusta University and the University of South Alabama. The Plaintiff had encountered significant challenges since emigrating to the USA in 2010 when she began applying for residency training but received no offers.

18.    A medical license is required to practice in America, necessitating completing an ACGME-

3

accredited residency.

19.    Upon consulting with various program directors to enhance her competitiveness as an applicant, Plaintiff was informed by OBGYN residency program directors at Augusta University and the University of South Alabama that they do not hire International Medical Graduates (IMGs). She confirmed this with the president of Augusta University, who advised her to enroll in an American medical school. Additionally, she reached out to ACGME and ECFMG for assistance but received no help.

20.    After the Plaintiff shared her hardship with the Senator of Mississippi, she was offered a position in Obstetrics and Gynecology residency training at the Medical Center of Navicent Health in 2016. Unfortunately, her tenure there was cut short when she was wrongfully dismissed after just three months.

21.    Unfortunately, Plaintiff was dismissed from the residency in retaliation for raising her concerns regarding a toxic discriminatory work environment in her previous residency, for which she was wrongfully dismissed.

22.    After the Plaintiff's dismissal, the Plaintiff sought academic advice from a trusted mentor, Dr. Paul Browne, Maternal Fetal Medicine faculty of Augusta University, and the program director of the University of Mississippi, Dr. Elizabeth Lutz, who advised her to apply to the medical school which she followed.

23.    On January 23, 2018, Dr. Badr received a letter of acceptance from NYIT. The Plaintiff said that for the first time, she felt she was on the right track to achieve her goals after four years of multiple rejections from residency programs and eight years of unemployment in southern states.

24.    Throughout Dr. Badr's four years at NYIT-COM, she had completed all her graduation requirements, successfully passed all her classes, and navigated through the tremendous stress of

4

4-year medical education, with frequent exams every 2 weeks, long studying nights, 48 months of clinical rotations, and 24-hour shifts, and substantial medical students loans to secure an obstetrics and gynecology (OBGYN) residency and subsequently to become an obstetrician and gynecologist in the United States.

25.    The Plaintiff completed all her graduation requirements only to be expelled from NYIT-COM two months before graduation.

26.    Plaintiff's school expelled Plaintiff based on religious and national origin discrimination because Defendant perceived Plaintiff's shared ancestry and ethnic characteristics from Egypt, in which Islam is the dominant religion or distinct religious identity as intertwined.

27.    The Plaintiff was told the reason for the expulsion was the failure of the last clinical rotation at Cedar Saini and the incident in another rotation at Catholic Health System.

28.    However, based on information and belief, external calls to expel Plaintiff from medical school to cover up for the discriminatory practices in southern universities against the IMGs are partly the reason behind her expulsion.

29.    The Plaintiff reached this conclusion for two reasons: First, she was denied the residency position for four years because she was an international medical graduate. Second, Dr. Paul Browne informed Plaintiff that the ACGME would uphold her rotation failure at Cedar Sinai Hospital and expel her from school for unprofessionalism. Subsequently, the Plaintiff was expelled on charges of unprofessionalism, suggesting that the plan outlined in the text was executed as described.

30.    The Plaintiff had requested Dr. Humayun Chaudhry, the CEO of the FSMB and a former dean of NYITCOM and the Accreditation Council for Graduate Medical Education (ACGME), to expunge/add an addendum to the record of the prior dismissal of residency to update her

performance records considering her performance in the evaluation in fourteen clinical rotations in the medical school. The Plaintiff sent a request to the ACGME on January 5th, 2022, after she finished her clinical rotation in Cedar Sinai Hospital and before she received a failure of this rotation. The timing of when she sent the email to the ACGME links the ACGME to her failure in Mount Sinai and her medical school expulsion. The Plaintiff accused the ACMGE of dictating the evaluation on Dr. Rimel to match the expulsion from prior residency to cover their legal position.

31.    After she finished her rotation at Cedar Saini Hospital, the Plaintiff interviewed at the University of Oklahoma with Dr. J.B., who questioned her about when she completed her Cedar Sinai rotation, using a threatening tone and referencing "*because of what you did in South Alabama."* The Plaintiff was unclear about the context of this statement, especially since she had left South Alabama in good standing with supportive letters of recommendation. She found Dr. Bundren's question suspicious. Following this interview, the Plaintiff received a failing grade from Cedar Sinai Hospital, leading to her expulsion.

32.    The ACGME is authorized to overrule the residency training program but has no direct oversight of medical schools.

33.    The Plaintiff is contesting her expulsion from NYIT-COM, which cited "challenging the authority" among the reasons for her expulsion.

34.    Upon information and belief, a third party, possibly the ACGME or another entity, is retaliating against her for suing a previous medical center over wrongful dismissal.

35.    The Plaintiff related that she suffered discrimination in the southern universities for 5 years, and again, she was expelled from medical school with non-expellable offenses because she was targeted by the ACGME and the southern universities for speaking up against the lawful practices against minorities in the south that have caused her loss of wages for over than 14 years.

36.    38 international medical graduates rejoined American Medical School in NYIT-COM. Yet, they all were able to graduate and received NYIT-COM to match in residency training. NYIT-COM discriminated against the Plaintiff because she was not provided the same chance to graduate and supported to get residency as the other IMGs in the EPP program.

37.    The Plaintiff believes that NYIT-COM blocked her access from matching into ObGyn residency by red-flagging her application by this expulsion for the reasons set forth below.

38.    There was an early outreach effort by two doctors, indicating NYIT-COM and the involvement of the ACGME. The first outreach Dr. B.B., a preceptor of clinical rotations in Internal Medicine at Long Island Jewish Forest Hill, offered the Plaintiff. to withdraw from medical school three months before formal expulsion proceedings began, but the Plaintiff politely refused. Knowing that Long Island Jewish Hospital does business with NYIT-COM, Plaintiff believes that the outreach by Dr. B.B. was linked to what NYIT-COM was planning on doing. They offered a withdrawal instead of expulsion, and because the Plaintiff refused the offer, NYIT-COM decided to expel her. This outreach raises concerns about the fairness and impartiality of subsequent code of conduct meetings.

39.    The second outreach occurred in the same month by Dr. Paul Browne, a faculty member of Maternal-Fetal Medicine, around April 4, 2021; it seemed to indicate in a phone conversation that there were series of meetings were held between Southern universities "University of South Alabama, Augusta University and Medical Center of Navient Health" and the ACGME to investigate why the Plaintiff was not able to match for 4 years and review the Plaintiff's prior residency training dismissal. The Plaintiff was not notified of these meetings and was not given the chance to present her side. Dr. Browne informed the Plaintiff that a deal had been arranged to allow the Plaintiff to graduate and cautioned the Plaintiff to be very careful during future clinical

rotations.

40.     Dr. Browne informed the Plaintiff that the ACGME's legal counsel had advised southern universities not to use the excuse of "*we do not hire IMGs*" to avoid legal liability. This suggests that the ACGME's legal counsel focused more on assessing legal liability than ensuring fair treatment for the Plaintiff. Furthermore, it appears they were advising these universities on how to manipulate the law to avoid legal consequences. The Plaintiff believes that ACGME exerted influence with NYIT-COM to expel her in retaliation for rejoining medical school.

41.     Two mentors from NYIT-COM, Dr. Karen Sheflin and Dr. Mervat Murad, told the Plaintiff that the decision of expulsion was requested from NYIT-COM from higher authorities, and NYIT-COM could not reverse it. Additionally, the vice dean of NYIT-COM, Dr. William Blazey, remarked, "NYIT-COM will not be able to graduate another medical student if we reinstated Sarah."

42.     The third contacted a private company called Residents Medical by "Sheila Aula," a private recruiting company that offered Plaintiff to withdraw from NYIT-COM in exchange for residency placement. At the time, the Plaintiff refused. The recruiter stated that "they work with NYIT-COM" and "they have done this before to another NYIT-COM medical student in her second year of medical school. The involvement of third-party organizations, such as Residents Medical, to withdraw student post-enrollment raises concerns about potential fraudulent practices." Nevertheless, it demonstrated a pattern of admitting students to the EPP program to profit from their admission and put the students into psychological trauma by orchestrating a disciplinary scene to expel the students.

43.     Notably, immediately following her expulsion, the Plaintiff received a book titled "My American Life," authored by Congresswoman Lauren Boebert, known for her anti-Muslim

remarks against Congresswoman Ilhan Omar. The book was sent from an Amazon affiliate located in Alabama. The Plaintiff believes this refers to the University of South Alabama, where she had volunteered, indicating potential involvement in her expulsion.

44.    It has come to our attention that NYIT-COM may have engaged in questionable practices to collect benefits and grants for their cooperative role in the expulsion of the Plaintiff: NYIT-COM was rewarded for expelling the Plaintiff and offered to secure residency placements for one of the class 2021 graduates, "K.N.," who was hired into internal medicine residency in University of South Alabama's residency in 2022, immediately after the Plaintiff's expulsion. The University of South Alabama had not previously hired any NYIT-COM graduates into its residency training programs before 2022, which raises concerns about a conspiracy and a connection between the Plaintiff's expulsion and the benefits received by NYIT-COM.

45.    NYIT-COM collected benefits for aid with a matching rate. This school has always struggled with her matching rates; after they cooperated to expel the Plaintiff, their match rate in 2023 was 100%.

46.    Dr. Paul Browne provided step-by-step updates, making her feel a plan was in place.

For example, he informed the Plaintiff that she would be censured instead of being put on probation before she was informed of the final decision of the ethical committee. He also informed her that she would be reinstated after one year. Then, updated her it would take an additional year. This aligns with statements from Dean Dr. Wadsworth, who advised the Plaintiff to pursue an MBA degree for one to two years. These matching statements indicate their collusion in the conspiracy. However, the Plaintiff believes he has no direct contact with NYIT-COM, and a third party must be in mediation.

**Religious and National Origin Discrimination**

47.    The Plaintiff believes that she was expelled in retaliation for speaking up against the healthcare disparity against minorities in the South due to her Middle Eastern origin and her religion for three reasons:

(1)    The disciplinary action started after she mentioned her prior expulsion from residency in the south.

(2)    NYIT-COM demonstrated a pattern of discriminating against Muslim Middle Eastern medical students who sought surgical specialties. Students from Egypt, Syria, and Pakistan, compared to non-Muslim students, were not under the same discriminatory treatment.

(3)    NYIT targeted the student, using a classmate who asked the student to convert to Christianity after expulsion.

(4)    Capricious expulsion with evidence of external influence is the strongest evidence to support the systematic targeting of Muslims in educational settings. A sudden interruption of the Plaintiff's education defamed her character as a Muslim scholar.

**THE DISCIPLINARY ACTION STARTED AFTER SHE MENTIONED HER PRIOR EXPULSION FROM RESIDENCY IN THE SOUTH**

48.    Plaintiff was targeted for her advocacy against the healthcare disparity in the Southern universities after Plaintiff suffered discrimination in hiring in OBGYN residency training programs for 4 years and wrongful dismissal from residency training with known repetitive dismissal of minorities. Plaintiff stated that the NYIT-COM disciplinary proceeding started in February 2021, and the Catholic Health System expelled Plaintiff from rotation after she shared her prior dismissal from residency to one of the preceptors of the Catholic Health System in September 2020.

10

49.     NYIT-COM had a similar retaliatory action as they forced a prior medical school dean, Dr. W.G, to resign in 2018 after he spoke against the discrimination in health care and his personal story of struggling to find residency as an Internationally trained doctor from Germany.

### NYIT-COM DEMONSTRATED A PATTERN OF DISCRIMINATING AGAINST MUSLIM MIDDLE EASTERN MEDICAL STUDENTS WHO SOUGHT SURGICAL SPECIALTIES

50.     Upon information and belief, at NYIT-COM, most Muslim students who sought surgical specialties of Middle Eastern descent face more disciplinary actions than the other students, especially Pakistani, Syrian, and Egyptian female students. Upon information and belief, students U., A.A., Y.A., M.A., S.A., and Y.E. have been subjected to disparate treatment based on their religion and Middle Eastern ancestry, as set forth below.

51.     Christian students had more favorable treatment than Muslim Egyptians. For example, unlike Plaintiff, M.A., Y.T., G.Y., M.A., and P.S. were helped to reach their goals even if they showed lower academic progress. For example, P.S. failed the UMSLE six times prior to admission to NYIT-COM and encountered academic challenges during his time at the school, including failing his first year. However, the school helped him overcome his difficulties, and he graduated and is now in residency training. In contrast, they do not extend the same level of forgiveness and support to Muslim students, as demonstrated clearly in Plaintiff's case.

52.     For instance, in 2012, NYIT-COM Expelled Middle Eastern Egyptian Muslim surgeon Ahdy Attallah. In 2020, NYIT-COM expelled Muslim Pakistani student S.S. despite his excellent grades in all his classes.

53.     By contrast, American non-Muslim medical students who committed egregious misconduct, such as cheating on exams, sexual harassment, or academic struggle, were allowed to graduate, but Muslim students were closely monitored and expelled for less serious infractions.

A.S., one of the NYIT-COM ambassadors, informed the Plaintiff that NYIT-COM was lenient with other students compared to her. Student A.Z. was reported for sexual harassment, and NYIT-COM took some disciplinary action against him but did not expel him. Student M.K. struggled academically and failed the MTOM- 813 course, but he was offered remediation to retake the test and graduated. Another student failed the clinical rotation but was not allowed to graduate.

54.    A.S. is an ambassador of NYIT-COM. A.S. has a reputation in the class "as an agent for NYIT-COM administration," as another classmate said that A.S. was known to be used by NYIT-COM to target students and collect evidence for the administration to be used against them in expulsion."

55.    A.S. admitted to the Plaintiff her role in the expulsion of one of the excellent Muslim medical students, S.S., the son of the former ambassador of Pakistan.

56.    Before the disciplinary meetings and expulsion, NYIT-COM tried to involve Plaintiff in unethical activities so they could hold it against her and expel her. A.S. attempted to entrap Plaintiff by cheating on exams. Specifically, A.S. offered to provide the Plaintiff with the MTOM-813 final exam. She called the Plaintiff before the exam, stating, "This is a very difficult exam; you will fail, and I have the answers I will give to you." The Plaintiff refused her offer.

57.    During school, A.S. asked Plaintiff if she should convert to Christianity because Islam is an evil religion; A.S.'s Mom sent Plaintiff a Bible.

58.     After NYIT-COM could not hold any nonethical reasons on the Plaintiff, Dean Achtizger launched her nonethical allegation against the Plaintiff by falsely alleging that Dr. Badr omitted her prior residency training from the admission committee. In another attempt to defame her as a Muslim student.

## CAPRICIOUS EXPULSION

**A.**     **First Incident**

59.  Plaintiff was dismissed for minor offenses during two clinical rotations that should ***not*** have resulted in expulsion. These circumstances, combined with the fact that her assigned rotation sites lacked residency programs, may have further hindered her residency prospects and contributed to a potentially retaliatory response. Additionally, the Plaintiff completed her third-year core rotation in obstetrics and gynecology at Mount Sinai South Nassau, a hospital known for not hiring osteopathic graduates, which added to her concerns about her chances of matching into a residency. The Plaintiff raised these concerns with Dr. Wadsworth, the dean, in January 2021 while on rotation at a Catholic Health System site. Shortly after raising these concerns, Instead of receiving the needed support, the Catholic Health System began closely scrutinizing the Plaintiff and documenting minor infractions as critical issues despite her satisfactory performance in the rotations.

60.  Plaintiff was subjected to a series of ethical reviews after they reported minor infractions to the dean of the medical school in March 2021. Dr. Catherine Caronia, Chief Academic Officer of the Catholic Health System and Chairman of the Graduate Medical Education (GME) Office at Good Samaritan Hospital, reported the Plaintiff to Dr. Wadsworth, Dean of NYIT-COM. Dr. Caronia stated, " Catholic health is not welcoming this student to do rotations on any of our sites." The Plaintiff believes that Dr. Caronia reported to her only after she submitted a request for a sub-internship at Good Samaritan Hospital in an effort to prevent her from getting Ob-Gy training. The Plaintiff was also subjected to a series of ethical reviews after they reported minor infractions to the medical school dean in March 2021.

61.   Dr. Catherine Caronia, Chief Academic Officer of the Catholic Health System and Chairman

of the Graduate Medical Education (GME) Office at Good Samaritan Hospital, reported the Plaintiff to Dr. Wadsworth, Dean of NYIT-COM. Dr. Caronia stated, "Catholic Health is not welcoming this student to do rotations on any of our sites."

62.   The vitriol Dr Caronia toward Plaintiff by labeling Plaintiff as "unprofessional" in an email to the dean, despite having no direct professional interactions with Plaintiff. This description is particularly harmful in the field of medical education, as allegations of unprofessionalism can severely impact a student's career by damaging their reputation and discouraging hospitals from considering them for future positions.

63.   Further, none of the Plaintiff's clinical evaluations described the Plaintiff as a non-professional. This action removed her access to her established clinical training environment, potentially obstructing her educational progress and career prospects without documented cause.

64.   Dr. William Blazey, Vice Dean of NYIT-COM, made a troubling statement: "NYIT-COM will not be able to graduate any more students if we did not expel this student," reflecting a bias.

65.   The initial incident involved Dr. Jerry Ballentine wrongfully censoring the Plaintiff in March 2021 due to a Catholic health incident. The Plaintiff contends that she would not have been expelled if she had not been wrongfully censured.

66.   The Plaintiff was assigned by NYIT-COM to do all her clinical rotations in the Catholic Health sites. Despite this, the Plaintiff has completed three Catholic Health System clinical rotations. In Psychiatry, Emergency Medicine, and Surgery, the Catholic Health System discriminated against the Plaintiff and conveyed to the Dean that the Plaintiff was unwelcome on any of their rotation. Especially after Plaintiff shared with all the preceptors of Catholic Health that she was dismissed from her prior residency in Georgia, Plaintiff noticed systematic targeting in several clinical rotations in St Joseph Hospital, NYU, and Cedar Saini Hospital.

67. Despite not having direct professional interaction with the Plaintiff, Dr. Catherine Caronia, serving as the Chief Academic Officer of the Catholic Health System and the chairman of the GME office of Good Sam Hospital, reported minor infractions to NYIT-COM 's Dean, Dr. Wadsworth, such as a failure to return ID badges, absence on President's Day due to a medical emergency, and described her emails requesting letters of recommendation as stalking. The Catholic Health System informed the Plaintiff that "the Plaintiff is not welcomed on any of their rotation sites." Upon which NYIT-COM changed Ambulatory and Internal medicine rotations scheduled in Catholic Health Sites to Northwell Health system. Dr Carolina reported the Plaintiff to block the Plaintiff's chance to match an OBGYN residency in Good Sam's Hospital.

68. The Plaintiff was subsequently referred to an ethical committee for minor infractions, resulting in wrongful censure by the vice president "Dr. Jerry Ballentine." These minor infractions did not signify intentional defiance or disregard for protocol. A draconian punishment of wrongful censure for these infractions caused the Plaintiff's expulsion and cost her career. These concerns could have been addressed through counseling, guidance, and institutional support mechanisms instead of censure, which caused Plaintiff's expulsion after Cedar Sinai failed her rotation.

69. The chairman of the GME office of Good Sam turned this report against the Plaintiff. The hospital confirms the conspiracy orchestrated by the ACGME regarding the Plaintiff's expulsion.

70. Furthermore, Plaintiff was treated less favorably compared to Christian American classmates at the same rotation of the Catholic Health System. For instance, in February 2018, during her clinical rotation of emergency medicine at St Joseph Hospital of the Catholic Health System, a Christian American classmate named "Anjalica" arrived late for her schedule, but the Chief Academic Officer of Catholic Health did not report Anjalica to the Dean of the NYIT-COM and did not face any ethical meetings, unlike Plaintiff. This discrepancy shows discriminatory

treatment within the Catholic Health system that cost the Plaintiff her medical career.

**First Incident**

71.     The preceptor, Dr. Awadallah, overseeing the Plaintiff's general surgery rotation at St. Catherine of Sienna (Catholic Health System), advised the Plaintiff to pursue away rotations to improve her chances of matching for residency.

72.     Following this guidance, the Plaintiff applied through the Visiting Student Learning Opportunities (VSLO) program and secured a rotation at Cedars-Sinai Hospital. However, during her Cedars-Sinai rotation, the Plaintiff failed without any opportunity for remediation—a stark departure from standard protocol.

73.      In typical circumstances, students experiencing difficulties during a rotation are informed of weaknesses and provided with remediation options to address these issues.

74.     In the Plaintiff's case, however, no such remediation was offered, and no concerns were raised about the Plaintiff's performance during the rotation.

75.     Failing Plaintiff without remediation reflects a deviation from the standard protocol and the due process of AAMC clinical evaluation. NYIT-COM has taken this failure as grounds for expulsion, contradicts NYIT-COM's student handbook, and does not consider failing a rotation an expellable offense.

76.     The Plaintiff completed a three-week clinical rotation at Cedar Sinai Hospital from November 15, 2021, to December 2, 2021. Initially, she received positive feedback but later received a failing evaluation. Dr. Rimel reported to NYIT-COM that the Plaintiff received negative feedback on her performance during the rotation and didn't improve. She believes this failure was imposed on the preceptor and that she was not given due process to challenge the grade. According to standard protocol, a preceptor must start remediation procedures, document weaknesses, and

16

give the student time to improve. However, no remediation was initiated during the rotation, so the preceptor had no right to fail her after she left the hospital. The Plaintiff believes that Dr Rimel was very supportive during her rotation.

77.    It should be noted that the Plaintiff received a positive message on ERAS from Cedar Sinai Hospital informing her that she is a strong applicant. They would like her on the waiting list for any cancellations, as they have already sent all the interview invitations by January.

78.    Third, Plaintiff repeated a rotation and successfully passed the rotation at Wyckoff Heights Hospital, demonstrating her capability. Despite this, NYIT-COM continued its discriminatory conduct and rejected the Plaintiff's appeal, which caused her dismissal.

79.    At this time, the Plaintiff completed all her graduation requirements and passed the OPP course, which indicates that she should graduate, but after four weeks, she was stunned to receive a report of failing at Cedar Sinai Hospital.

80.    Plaintiff was expelled just two months before graduation despite completing her graduation requirement, but for non-expellable offenses: two clinical rotations that were not significant infractions that were nonclinical, and the penalty was grossly disproportionate to the offense per NYIT-COM policy.

81.    The Plaintiff's expulsion was unjustified, particularly when considering that other students who failed rotations did not face similar consequences. Another classmate failed rotations yet was not expelled from NYIT-COM, which reflects disparate treatment based on the Plaintiff's religion and national origin.

82.    According to NYIT-COM school handbook guidelines, failing a clinical rotation is ordinarily not a dismissal offense, and they should have accepted the appeal, but there was a lack of due process. This was unlike the treatment of other non-Muslim and non-Egyptian students who failed

and repeated rotations, yet NYIT-COM accepted their appeals and allowed them to graduate.

83.    Upon information and belief, NYIT-COM had been lenient with other students, such as a student who is non-Egyptian non-Muslim A.Z., who was reported for sexual harassment and subjected to disciplinary action, but NYIT-COM did not expel him.

84.    NYIT-COM has demonstrated bias. Student H.W. was reported for cheating on the exam and having academic delays due to not providing the COMLEX exam on time. He was treated with leniency and not expelled.

85.    In contrast, the Plaintiff was expelled despite following instructions and being held to a higher standard. She successfully passed all her graduation requirements on time.

**Second Incident**

86.    The second reason the Plaintiff was expelled involved a wrongful accusation of misinformation on the admission application.

87.    After the Plaintiff's defense against the failed rotation, the school persisted in targeting the Plaintiff and scrutinized the admission process to gather additional evidence against her.

88.    Specifically, the admission dean, Mr. Mary Ann Achtziger, falsely accused Plaintiff of providing misinformation on her medical school application.

89.    The Plaintiff has no knowledge that dismissal from prior residency will prevent her from admission; therefore, she has no motive to omit it. The Plaintiff reviewed the admission eligibility on the NYIT website, and dismissal from prior residency was not mentioned on the exclusion criteria for admission to NYIT-COM.

90.    The school harbored personal animosity toward Egyptian students based on the following factors:

(1)    A pattern of targeting Egyptian students was evident in a prior incident involving

another Muslim Egyptian medical student, Ahdy Attallah, in 2012. Attallah, a practicing surgeon in Egypt before immigrating to the USA and joining NYIT-COM, publicly documented his experience with Achtziger, alleging that she spread falsehoods and made wrongful accusations about his admission application. He was subsequently expelled and later sued NYIT-COM, specifically mentioning Achtziger's toxic behavior targeted toward him. The school demonstrated the same pattern of attacking the integrity of the Plaintiff of Egyptian origin, poisoning the ethics committee members, and poisoning their perception of the Plaintiff by casting doubt on the Plaintiff's integrity through the misinformation allegation.

(2)    Regarding the false allegation of the Plaintiff, the school claimed that the admission department was not informed about the prior 3 months of residency in 2016. The dean of the admission department of NYIT-COM deliberately withheld a letter of recommendation from the ethical committee; this letter was from the Plaintiff's mentor, "Dr. Paul Browne," who had informed the admission committee of NYIT-COM about the Plaintiff's prior dismissal from a residency in 2016. Had this letter been provided to the ethics committee during the investigation, Plaintiff would not have been dismissed. Dr. Paul Browne, a former mentor at Augusta University, Informed the NYIT-COM admission department of the dismissal from prior residency. He wrote: "In *July 2016, Dr Adam accepted PGY2 position at Mercer University in Macon, GA. Her career goal is to practice clinical medicine in USA. Unfortunately, she was terminated from her position there after only 4 months.*" The admission committee did not see this letter, admitted the Plaintiff, and blamed the Plaintiff for not informing them after 4 years of medical education

91.   Plaintiff disclosed her prior residency on seven occasions:

(1)    On a phone call before admission with Mr. Edward Dettling," the admission officer, who approved that Plaintiff could submit what she can disclose due to the legal proceedings with prior residency, then later send an updated resume, which Plaintiff did.

(2)    The Plaintiff published her address as an author on a scientific research paper & referenced it in her old resume submitted with her admission application and was a topic of discussion during the admission interview.

(3)    Plaintiff disclosed the residency during her admission interview with Dr "Olga Savinova" with Plaintiff's because she asked Plaintiff about the research that Plaintiff published during this residency. The discussion about research is documented in a note written during the admission interview included in the Plaintiff's files in NYIT-COM possession.

(4)    Plaintiff mentioned her experience in previous residency in a secondary application to AACOMS, but NYIT-COM did not keep a copy of the secondary applications of AACOMS in a second blatant violation of the high education laws that mandate NYIT-COM to keep admission records permanently for the enrolled students. The Plaintiff called AACOMS to retrieve the application. AACOMS also deleted the old application. Another violation of the higher education laws.

(5)    The Plaintiff included her NPI number in the un-updated resume submitted with the application. The NPI number is only given to doctors who start their residency training, which should inform the admission committee that this applicant has been in previous residency training.

(6)    In addition to the letter of recommendation from Dr Paul Browne, who informed NYIT-COM about the prior residency.

(7)    After the expulsion, the Plaintiff brought another piece of evidence to the attention of Dean's Wadsworth and requested that the investigation be reopened, but they declined her request. Plaintiff referenced her prior residency, "Medical Center of Navicent Health," as the author's address of two scientific articles published publicly on her resume. This was another chance for the admission committee to see it.

(8)    The Plaintiff has disclosed her dismissal from a previous residency in 399 OBGYN residency applications across three consecutive application cycles in 2022, 2023, and 2024. If she had intentionally omitted this prior experience on an admission application, it would have been more advantageous for her to do so in the ERAS residency experience section.

(9)    NYIT-COM stated in the final dismissal letter that the reasons for Plaintiff's dismissal were two hospital incidents during clinical rotation, not the application charge. NYIT-COM refused to amend the termination letter to remove these unfounded charges, forcing Plaintiff to disclose them in all OBGYN residency training applications for two consecutive ERAS matching cycles. The last application was submitted in December 2023; this intentional slander and defamation to Plaintiff significantly reduced Plaintiff's chances of matching in a residency. The Plaintiff was portrayed as a liar, and her professional and personal reputation was permanently and irreparably damaged, making NYIT-COM liable for slander and defamation.

92.    In addition, NYIT-COM deleted all the emails from the admission Officer Edward Dettling and thus removed the only evidence that Plaintiff updated her application. The Plaintiff requested the Dean of Admissions to withdraw these charges since they tempered with the evidence, but Dean Achtziger refused to withdraw this charge."

93.    Dean Achtziger thereafter admitted that they deleted the emails that, if she had kept them,

would contain the Plaintiff's updated resume.

94.    NYIT-COM has violated the high education laws that mandate universities permanently keep records of enrolled students, including the emails used for admission purposes.

95.    Further, Dean Achtziger has violated Plaintiff's rights regarding document retention and breached Plaintiff's educational contract, which stipulates that universities must permanently retain enrolled students' admission documents, including emails. In addition to mishandling the emails, Plaintiff discovered that the PDF of the admission application had been modified on February 14, 2022, two days after they brought the charge of misinformation on February 13, 2022. Upon consulting an Adobe specialist, it was confirmed that the file had been re-edited two days after the ethical meeting, following Plaintiff's request to view her application.

96.    Based on available information, NYIT-COM allegedly pressured Mrs. Achtziger to retire promptly following the Plaintiff's expulsion.

97.    NYIT-COM allegedly evaluated the Plaintiff's grades, changing her passing grades in the MTOM-813 course to failing grades to justify her expulsion. The Plaintiff asserts that she successfully completed the MTOM-813 course with a passing score on March 16, 2022. However, upon reviewing the transcript on October 18, 2022, the Plaintiff found that her passing grade had been changed to a failure grade.

98.    Furthermore, on December 13, 2023, NYIT-COM provided a transcript that did not include the original passing grade and instead showed a failing grade. The original transcript with the passing grade was removed from the Plaintiff's admission file. The Plaintiff asked NYIT-COM's general counsel, Ms. Flickinger, about the lost original transcript and asked to review the original transcript. She was informed that the original documents were archived, but she refused access to them.

99.   NYIT-COM did not follow due process regarding failing grades; if Plaintiff had indeed failed, NYIT-COM should have initiated academic disciplinary actions to address her failure, but this did not occur. Additionally, there was different treatment compared to a classmate named M.K., who also failed the MTOM-813 exam but was not dismissed. The Plaintiff alleges that she was not offered remediation or put on academic notice in violation of school policy.

100.  The Plaintiff believes the internal investigation was biased and resulted in a wrongful expulsion for the following reasons.

(1)   The members of the Ethical Committee who voted for the initial expulsion should have abstained from voting until the admission dean provided all necessary documents, such as "deleted emails" and "Letter of recommendation," for the committee's assessment. Without these crucial documents, the committee's decision to expel the Plaintiff was flawed.

(2)   All committee members were faculty employed by NYIT-COM and received salaries from the institution. To ensure fairness and impartiality in such investigations, external faculty or students should have been part of the committee.

(3)   Dean Dr. Wadsworth appointed a final ethics committee comprising non-clinicians, primarily Ph.D. holders, unfamiliar with clinical settings. Their involvement in making decisions regarding clinical incidents in hospitals without appropriate expertise was a clear error.

(4)   Furthermore, the committee's refusal to meet with the Plaintiff disregarded the principles of due process, accuracy, and fairness in its decision-making, ultimately leading to the Plaintiff's abrupt and unjust expulsion. This disregard for the Plaintiff's years of dedication and hard work in her career before expulsion reflects a lack of

consideration for the seriousness of their actions.

101.   Despite contesting the termination, the Plaintiff's expulsion letter stated that it was based on results from clinical incidents rather than misinformation. This admission is self-incriminating, as NYIT-COM has acknowledged its error in levying these unethical charges against the Plaintiff. Despite this clarification, they have declined to eliminate the admission charges from the expulsion letter, which makes NYIT-COM.

102.   In addition, the Plaintiff was scheduled for rotations at Catholic Health System sites, including St. Catherine of Sienna for Surgery, St. Joseph Hospital for Emergency Medicine, and Mercy Hospital for internal medicine, all lacking residency programs. The Plaintiff was set to do all her clinical rotations in the Catholic Health sites, including St. Catherine of Sienna for Surgery, St. Joseph Hospital for Emergency Medicine, Mercy Hospital for Internal Medicine, and office-based settings for family medicine. None of these sites offered residency programs, limiting Plaintiff's opportunities to build connections and market herself effectively for residency positions.

103.   This lack of access to residency training facilities has disadvantaged Plaintiff compared to peers who rotated at sites with residency programs, which are valuable for networking and increasing match chances. This unequal treatment is direct evidence of discrimination based on national origin and religion.

104.   After the expulsion, a faculty member, Felecia Bruno of the Ethical Committee, told the Plaintiff, "Return to "Egypt" where you came from," referring to the Plaintiff's national origin and religion, implicitly questioning her qualifications based on her foreign background.

105.   The consequences of Plaintiff's expulsion have caused significant, lasting harm to her career prospects. Plaintiff believes that NYIT-COM orchestrated Plaintiff's exclusion to deprive her of

the institutional residency services to guide her through the matching process despite being in good academic standing prior to the commencement of the ethical meetings that targeted her. These meetings, culminating in her expulsion, were orchestrated to exclude Plaintiff from receiving the critical guidance and recommendations typically provided to students as they prepare for residency matching for three subsequent match cycles.

106.    The Plaintiff's dismissal was not merit-based but was due to her national origin as an Egyptian Muslim pursuing a surgical specialty.

107.    The non-Muslims received significant academic support despite struggles, better accommodations, or favorable treatment than Egyptian Muslims.

108.    For instance, Peter Sorial failed the UMSLE six times before admission to NYIT-COM and encountered academic challenges at the school, including failing his first year. However, the school helped him overcome his difficulties, and he graduated and is now in residency training. unlike Plaintiff, Mirrette Atnas, Yousif Tawadros, George Maher Modey Ameen, non-Muslims, and Peter Sorial, all received a supportive environment to achieve their goals and gain residency. In contrast, they do not extend the same level of forgiveness and support to Muslim students. Muslim students know they must be very careful about how they conduct themselves in school, fear of disciplinary actions.

109.    Upon information and belief, Muslim students were systematically assigned to non-hospital settings, office-based rotations, or hospitals lacking residency programs, which impaired their chances of securing desirable residency placements. In contrast, non-Muslim students were often assigned rotations in hospitals with established residency training programs, providing greater exposure to networking opportunities and experience that can improve match outcomes. This discrepancy led to lower match rates for Muslim students in competitive or categorical specialties.

Muslim students such as Mohammad Yasin, Iffat Adeel, Tamzid Hassan, and Umme Romana reportedly struggled to secure categorical spots, often needing to accept preliminary or transitional-year positions, while others, including the Plaintiff and Anjum Kazi, did not match at all.

110.    The Plaintiff was scheduled for rotations at Catholic Health System sites, including St. Catherine of Sienna for surgery, St. Joseph Hospital for emergency medicine, and Mercy Hospital for internal medicine, all lacking residency programs. This, she asserts, limited her ability to build connections essential for matching into a categorical residency.

111.    Upon information and belief, there is a pattern of targeted disciplinary actions by NYIT-COM against Muslim students compared to non-Muslims. According to the Plaintiff, students who declared an interest in competitive or surgical specialties, like the one the Plaintiff aimed at pursuing, were more likely to face disciplinary proceedings. Disciplinary actions on students' records can significantly decrease their chances of matching into competitive specialties.

112.    For example, Muslim students, such as Jasmine El-Sokary, Iffat Adeel, Menna Alaskandrany, Ayham Alsaab, May Ali, Soha Omar, Sarah Abdel Karim, and Hassan Wakar, were disproportionately subjected to disciplinary scrutiny, particularly if they expressed interest in surgical fields while non-Muslim students with similar or lower academic performance were not targeted in the same way.

113.    After the expulsion, Plaintiff applied to 600 obstetrics and Gynecology residency training programs in two application cycles in 2023 and 2024. After the Plaintiff secured ten interviews in 2022 before the expulsion, the Plaintiff was not extended any interview for two years as an IMG. The Plaintiff had to disclose the expulsion from medical school in all residency training programs, as required by the electronic residency application system (ERAS) application regulation.

114.    The program director informed her that we cannot extend interviews without your medical

diploma from NYIT-COM, as it is required before you sign the contract. The program directors offered to help the Plaintiff if she obtained her diploma and advised her to obtain legal representation and take legal action to retrieve her diploma.

115.   NYIT-COM significantly harmed the Plaintiff's career. All her classmates enrolled in the EPP program who had previously been unable to secure matches before attending NYIT-COM successfully matched 100% after graduating. The Plaintiff's classmates are now nearing completion of their third year of residency training, while the Plaintiff is unable to obtain any clinical rotations after they suddenly interrupted her education intentionally to ban her from matching into OBGYN. This means the Plaintiff was on the verge of matching to residency in 2022, but the trajectory of this wrongful expulsion prevented her from matching and shattered her dream and career. The Plaintiff attributes her three years of delay to NYIT-COM's negligent administrative processes. In 2022, during her 4th year in NYIT-COM and after two years of clinical rotations, the year when the Plaintiff was supposed to graduate, she applied to 399 residency training programs, and she was expected to match in one of the ten interviews, eight of them from obstetrics and gynecology residency interviews that she received. NYIT-COM intentionally expelled Plaintiff two days before the match result to prevent her from starting residency in case she matched in one of these interviews.

116.   After the expulsion, the Plaintiff's education was suddenly interrupted. She was cut from the office of residency training services intentionally to prevent her from getting any clinical rotations, which further hurt her chance to match in OBGYN. The Plaintiff secured a clinical rotation with Dr. F.N. at NYU as a volunteer. Dr. F.N. was pressured to drop her rotation and stop any research project with her. The Plaintiff was told that the legal department of NYU Hospital had asked Dr. F.N. to drop her rotation and withdraw his support of her application. In addition,

Dr. Genevive Sicuranza was very supportive of the Plaintiff before the expulsion, but after the non-ethical accusation, Dr. G.S. withdrew her recommendation letter from the applicant. Dr B.P., the internal medicine faculty at Long Island Jewish Foresthill, has also withdrawn her recommendation from the Plaintiff. The Plaintiff was lifted to struggle in despair without scholarly access to any hospital. Her application for hospital volunteering was not returned to her for undisclosed reasons. During this time, Plaintiff carried the burden of continuing her medical education by writing and publishing medical and scientific articles, publishing a medical review book for USMLE licensing exams, and publishing another book for obstetrics and Gynecology to keep up her medical education. The Plaintiff has also tried to use her medical diploma to secure OBGYN residency as an IMG, but the expulsion from medical school discourages program directors from considering her. The Plaintiff has tried to apply to several medical schools, but they declined her application because of the expulsion records.

117.   The expulsion letter stated that the Plaintiff was expelled due to the clinical rotation incidents. NYIT-COM characterized Plaintiff's conduct as "unprofessional." The school cannot use the word "unprofessional" unless explicitly mentioned in the evaluation reports by the preceptors. Notably, none of the Plaintiff's preceptors of Fourteen rotations have described her as "unprofessional." She was not in the Plaintiff's formal clinical evaluation reports, including the failed ones.

118.   Using the word "unprofessional" has unjustly harmed Plaintiff's professional reputation within the medical community. The Plaintiff has dedicated her entire life to academic medicine and has amassed an impressive clinical research and work resume, spanning 14 years of volunteering in clinical research and medical education, invested in NYIT-COM education, and carried 338k student loans to secure her residency spot. To have Plaintiff's reputation tarnished by

such a reckless action is devastating.

119.    After the Plaintiff's dismissal, she suffered a sudden interruption of her education, medical insurance, and academic progress. The Plaintiff was removed from any assistance from the NYIT-COM residency services office and was abandoned from education or academic access. The dismissal also prevented her from accessing clinical rotation through the VSLO website, which is the only one accessible to American medical students.

120.    Unlike another unmatched student of her class, who was helped by the residency services and was paid during a transitional year or continued to have clinical rotations, Plaintiff was not provided any of these services, and her education was interrupted. This disparity suggests discriminatory practices against the Plaintiff. Deliberately expelling Plaintiff allowed the institution to avoid the costs of providing her a transitional year. The Plaintiff met with the program director of General Surgery at a hospital in New York, who informed her that NYIT-COM should have provided her with a transitional year, as they had done for her classmates. The Plaintiff's dismissal left her without income for two years after her dismissal. This decision significantly impacted the Plaintiff's clinical career.

121.    The dean, Dr Wadsworth, advised Plaintiff to take an MBA right after expulsion.

122.    During the two years since her expulsion, she has tried to get clinical rotations or volunteer in hospitals, but no hospital has accepted her because the hospitals have returned to the school for feedback. In addition, the private clinical rotations are out of her financial ability; the hospital rejected her request due to the expulsion. The Plaintiff was able to volunteer for five years in hospitals before she started medical school, but she was not able to secure any rotation after NYIT-COM's intentional act of expulsion.

123.    Plaintiff has been accused of unethical misconduct regarding misinformation on Plaintiff's

application, and her moral, professional character, and credibility have been permanently damaged.

124.   In addition, Plaintiff has been financially damaged, where she could not secure a paid job of residency training and pay her student loan of $338,000 in addition to the accumulating interest of around 1200 $ monthly.

125.   Plaintiff has exhausted all internal administrative remedies and has satisfied all conditions precedent prior to the commencement of this suit.

126.   This action seeks damages, injunctive relief, attorneys' fees, and other appropriate equitable and legal relief on behalf of Plaintiff as a result of Defendants' violation of her civil rights.

127.   Defendant is under a duty to not discriminate based on religion or practices that discourage enrollment or involvement with a school such as Defendant that receives federal funds.

128.   Plaintiff, a Muslim, is a member of a protected class and beneficiary of this non-discrimination mandate because, being a Muslim from Egypt, Defendant perceived Plaintiff's shared ancestry and ethnic characteristics from Egypt in which Islam is the dominant religion or distinct religious identity as intertwined.

129.   Defendants have breached their duty of non-discrimination.

130.   Title VI prohibits discrimination based on an individual's religion in programs and activities and retaliation receiving federal financial assistance, such as Defendant when Plaintiff, who is a Muslim from Egypt, perceived Plaintiff's shared ancestry and ethnic characteristics from Egypt in which Muslim is the dominant religion or distinct religious identity as intertwined.

131.   The Defendants were deliberately indifferent and subjected Dr. Badr to disparate treatment due to Plaintiff's being a Muslim from Egypt and thus perceived Plaintiff's shared ancestry and

ethnic characteristics from Egypt in which Islam is the dominant religion or distinct religious identity as intertwined religion, which in turn caused her dismissal from Defendant.

132.    Plaintiff was deprived of educational benefits as a result of the harassment and disparate treatment: (1) a supportive, scholastic environment free of discrimination and harassment and (2) the ability to complete her education.

133.    As a direct and proximate result of Defendants' unlawful national origin/religious discrimination, which caused her dismissal, Plaintiff suffered and will continue to suffer harm, including but not limited to a loss of educational opportunities, a loss of career opportunities, humiliation, embarrassment, reputational harm, emotional, physical, and psychological distress, and other damages.

WHEREFORE, Plaintiff, in an amount greatly in excess of seventy-five thousand ($75,000.00) dollars, special damages for a lost career as a result of not obtaining her medical degree, including the salary she would have earned if the Plaintiff was conferred her medical degree; granting compensatory damages for injuries and accompanying pain and suffering; tuition reimbursement; career lost earnings; and other damages sustained by Plaintiff; injunctive relief compelling Defendant to reinstate Plaintiff into the program, graduate Plaintiff and confer a medical degree, to provide assistance regarding OBGYN residency training services, expungement of expulsion records, reasonable attorney fees, and any other relief that is just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues so triable as a matter of right.

Dated: New York, New York
       November 22, 2024

STEWART LEE KARLIN
LAW GROUP, P.C.


Stewart Lee Karlin, Esq.
111 John Street, 22nd Floor
New York, New York 10038
(212) 792-9670
slk@stewartkarlin.com