UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MARWA BADR,

                       **24-CV-05333 (JMA)(JMW)**

    Plaintiff,

v.

NEW YORK INSTITUTE OF TECHNOLOGY,
NYIT-COM COLLEGE OF OSTEOPATHIC
MEDICINE,

    Defendant.
--------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT


STEWART LEE KARLIN
LAW GROUP, P.C.

Natalia Kapitonova, Esq.
*Attorneys for Plaintiff*
111 John St., 22nd Floor
New York, NY 10038
(212) 792-9670
cnk@stewartkarlin.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES.............................................................................................. ii

PRELIMINARY STATEMENT..........................................................................................1

FACTUAL STATEMENT.............................................................................................. 1-8

    1.    Background Information ................................................................................ 1-2

    2.    Religious And National Origin Discrimination ........................................... 2-8

ARGUMENT .............................................................................................................. 9-19

    POINT I: STANDARD OF REVIEW .............................................................9

    POINT II: PLAINTIFF HAS ALLEGED A PLAUSIBLE CLAIM FOR
    RELIGIOUS AND NATIONAL ORIGIN DISCRIMINATION ................................. 9-16

    1.    Plaintiff Alleges Discrimination On A Prohibited Basis: Religion And
        National Origin ......................................................................................... 10-11

    2.    The Amended Complaint Alleges That The Discrimination Was Intentional.......11

    3.    Plaintiff Alleges That Her Religion And National Origin Were Motivating
        Factors In The Adverse Action ................................................................. 11-12

    4.    Plaintiff Was Dismissed For Minor Offenses, And It Was Evident That Her
        Dismissal Was Due To Discrimination And Retaliation ................................. 12-16

    POINT III: PLAINTIFF HAS ADEQUATELY PLEADED RETALIATION
    UNDER TITLE VI................................................................................................ 16-19

    1.    Plaintiff Engaged In Protected Activity .............................................................17

    2.    Plaintiff Suffered Adverse Action ......................................................................17

    3.    The Complaint Pleads A Causal Connection ................................................. 17-19

CONCLUSION.................................................................................................................19

# TABLE OF AUTHORITIES

## *Cases*

*Alexander v. Sandoval,*
    532 U.S. 275, 279 (2001) ............................................................................9, 16

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937, 1949 (2009) ...........................................................9, 10, 15, 19

*Bell Atl Corp. v. Twombly,*
    550 U.S. 544, 570 (2007) ...................................................................................9

*Bloomberg v. New York City Dept. of Educ.,*
    410 F. Supp. 3d 608, 624 (S.D.N.Y. 2019) ...............................................16, 17

*Blum v. Schlegel,*
    18 F.3d 1005 (2d Cir. 1994) ............................................................................18

*Johnson v. City of Shelby,*
    574 U.S. 10, 11 (2014) ....................................................................................18

*Kassner v. 2nd Ave. Delicatessen Inc.,*
    496 F.3d 229, 237 (2d Cir. 2007) .....................................................................9

*Palmer v. Penfield Cent. Sch. Dist.,*
    918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013) ...............................................16, 18

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,*
    602 F.3d 57, 64 (2d Cir. 2010) .........................................................................9

## *Laws and Statutes*

Fed. R. Civ. P. 8(a) .............................................................................................9

Federal Rule 12 (b)(6)......................................................................................9, 10

Title VI of the Civil Rights Act of 1964 ...........................................1, 9, 10, 16, 18, 19

<u>**PRELIMINARY STATEMENT**</u>

Plaintiff MARWA BADR ("Plaintiff"), through her attorneys, Stewart Lee Karlin Law Group, P.C., submits this memorandum in opposition to Defendant's Motion to dismiss. This action was brought to remedy discrimination on the basis of national origin and religious discrimination pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d), et seq. ("Title VI"). For the reasons outlined in this memorandum of law, the motion to dismiss should be denied in its entirety.

<u>**FACTUAL STATEMENT**</u>

1. **Background Information[1]**

Plaintiff MARWA BADR (a/k/a Sarah Adam) was a fourth-year medical student at NYIT-COM College of Osteopathic Medicine (hereinafter "NYIT-COM") who, due to discriminatory practices against her, was unable to graduate and obtain her degree even though she completed almost all of the required courses. Plaintiff is a Muslim student of Middle Eastern descent (Egypt), and her religion is Islam. In 2018, she enrolled in the Emigre Physicians program (EPP) at NYIT-COM, a unique program that enrolls 38 international medical graduates. AC ¶9-12

Plaintiff is an Egyptian doctor. She completed seven years of medical school in Egypt with honors, followed by a four-year obstetrics and gynecology residency training program in Egypt, during which She performed approximately 5,000 vaginal deliveries, 600 cesarean sections, and other gynecologic surgeries, and authored fifteen scientific publications in women's reproductive health. Upon immigrating to the United States of America, Plaintiff volunteered as a clinical research fellow and shadowed in clinics for four years, from 2011 to 2015, at Augusta University and the University of South Alabama. Plaintiff was wrongfully dismissed from the residency in

---

[1] For a complete statement of facts, the Court is respectfully referred to the Amended Complaint Dkt. No. 19, referred hereinafter as "AC".

retaliation for raising her concerns regarding a toxic, discriminatory work environment in her previous residency. Plaintiff was advised to apply to an American Medical School because, as a foreign doctor, she could not obtain job opportunities in the United States. Plaintiff then applied and was accepted to NYIT-COM. Over the course of four years, Plaintiff fulfilled all graduation requirements and was just two months away from completing her American degree before her expulsion in March of 2022. AC. ¶9-14. On March 22, 2022, Plaintiff was dismissed from NYIT-COM after completing 4 years of medical graduation requirements. Id.

**2. Religious And National Origin Discrimination**

Plaintiff believes that she was expelled in retaliation for speaking up against the healthcare disparity against minorities in the South due to her Middle Eastern origin and her religion for three reasons:

1. (1) The disciplinary action started after she mentioned her prior expulsion from residency in the south.

2. (2) NYIT-COM demonstrated a pattern of discriminating against Muslim Middle Eastern medical students who sought surgical specialties. Students from Egypt, Syria, and Pakistan, compared to non-Muslim students, were not under the same discriminatory treatment.

3. (3) NYIT targeted the student, using a classmate who asked the student to convert to Christianity after expulsion. AC ¶47.

Plaintiff believes the internal investigation was biased and resulted in a wrongful expulsion because: (1) The members of the Ethical Committee who voted for the initial expulsion should have abstained from voting until the admission dean provided all necessary documents, such as "deleted emails" and "Letter of recommendation," for the committee's assessment. Without these crucial documents, the committee's decision to expel the Plaintiff was flawed. (2) All committee members were faculty members employed by NYIT-COM and received salaries from the institution. To ensure fairness and impartiality in such investigations, external faculty or students

2

should have been part of the committee. (3) Dean Dr. Wadsworth appointed a final ethics committee comprising non-clinicians, primarily Ph.D. holders, who were unfamiliar with clinical settings. Their involvement in making decisions regarding clinical incidents in hospitals without appropriate expertise was a clear error. (4) Furthermore, the committee's refusal to meet with the Plaintiff disregarded the principles of due process, accuracy, and fairness in its decision-making, ultimately leading to the Plaintiff's abrupt and unjust expulsion. This disregard for the Plaintiff's years of dedication and hard work in her career before expulsion reflects a lack of consideration for the seriousness of their actions. Despite contesting the termination, the Plaintiff's expulsion letter stated that it was based on results from clinical incidents rather than misinformation. This admission is self-incriminating, as NYIT-COM has acknowledged its error in levying these unethical charges against the Plaintiff. Despite this clarification, they have declined to eliminate the admission charges from the expulsion letter.  AC¶48-74.

In addition, the Plaintiff was scheduled for rotations at Catholic Health System sites, including St. Catherine of Siena for Surgery, St. Joseph Hospital for Emergency Medicine, and Mercy Hospital for Internal Medicine, all of which lacked residency programs. The Plaintiff was scheduled to complete all her clinical rotations at Catholic Health sites, including St. Catherine of Siena for Surgery, St. Joseph Hospital for Emergency Medicine, Mercy Hospital for Internal Medicine, and office-based settings for family medicine. None of these sites offered residency programs, limiting Plaintiff's opportunities to build connections and market herself effectively for residency positions. This lack of access to residency training facilities has disadvantaged Plaintiff compared to peers who rotated at sites with residency programs, which are valuable for networking and increasing match chances. This unequal treatment is direct evidence of discrimination based on national origin and religion. After the expulsion, a faculty member, Felecia Bruno of the Ethics

3

Committee, told the Plaintiff, "Return to Egypt, where you came from," referring to the Plaintiff's national origin and religion, implicitly questioning her qualifications based on her foreign background. The consequences of the Plaintiff's expulsion have caused significant and lasting harm to her career prospects. Plaintiff believes that NYIT-COM orchestrated Plaintiff's exclusion to deprive her of the institutional residency services to guide her through the matching process, despite being in good academic standing prior to the commencement of the ethical meetings that targeted her. These meetings, culminating in her expulsion, were orchestrated to exclude Plaintiff from receiving the critical guidance and recommendations typically provided to students as they prepare for residency matching for three subsequent match cycles. The Plaintiff's dismissal was not merit-based but was due to her national origin as an Egyptian Muslim pursuing a surgical specialty.

The non-Muslims received significant academic support despite struggles, better accommodations, or favorable treatment than Egyptian Muslims. AC¶101-105.

For instance, Peter Sorial failed the UMSLE six times before admission to NYIT-COM and encountered academic challenges at the school, including failing his first year. However, the school helped him overcome his difficulties, and he graduated, subsequently entering residency training. Unlike the Plaintiff, non-Muslims such as Mirrette Atnas, Yousif Tawadros, George Maher Modey Ameen, and Peter Sorial all received a supportive environment that enabled them to achieve their goals and gain residency. In contrast, they do not extend the same level of forgiveness and support to Muslim students. Muslim students know they must be very careful about how they conduct themselves in school, for fear of disciplinary actions. Upon information and belief, Muslim students were systematically assigned to non-hospital settings, office-based rotations, or hospitals lacking residency programs, which impaired their chances of securing

4

desirable residency placements. In contrast, non-Muslim students were often assigned rotations in hospitals with established residency training programs, providing greater exposure to networking opportunities and experience that can improve match outcomes. This discrepancy led to lower match rates for Muslim students in competitive or categorical specialties. Muslim students such as Mohammad Yasin, Iffat Adeel, Tamzid Hassan, and Umme Romana reportedly struggled to secure spots, often needing to accept preliminary or transitional-year positions, while others, including the Plaintiff and Anjum Kazi, did not match at all. The Plaintiff was scheduled for rotations at Catholic Health System sites, including St. Catherine of Siena for surgery, St. Joseph Hospital for emergency medicine, and Mercy Hospital for internal medicine, all lacking residency programs. This limited her ability to build connections essential for matching into a categorical residency. AC¶106-111. Upon information and belief, there is a pattern of targeted disciplinary actions by NYIT- COM against Muslim students compared to non-Muslims. According to the Plaintiff, students who declared an interest in competitive or surgical specialties, like the one the Plaintiff was pursuing, were more likely to face disciplinary proceedings. Disciplinary actions on students' records can significantly decrease their chances of matching into competitive specialties. For example, Muslim students, such as Jasmine El-Sokary, Iffat Adeel, Menna Alaskandrany, Ayham Alsaab, May Ali, Soha Omar, Sarah Abdel Karim, and Hassan Wakar, were disproportionately subjected to disciplinary scrutiny, particularly if they expressed interest in surgical fields, while non-Muslim students with similar or lower academic performance were not targeted in the same way. After the expulsion, the Plaintiff applied to numerous obstetrics and Gynecology residency training programs in two application cycles, in 2023 and 2024. After the Plaintiff secured ten interviews in 2022 before the expulsion, the Plaintiff was not extended any interviews for two years as an IMG. The plaintiff was required to disclose the expulsion from medical school in all

residency training programs, as mandated by the Electronic Residency Application System (ERAS) application regulations. The program director informed her that we cannot extend interviews without your medical diploma from NYIT-COM, as it is required before you sign the contract. All her classmates enrolled in the EPP program who had previously been unable to secure matches before attending NYIT-COM successfully matched 100% after graduating. The Plaintiff's classmates are now nearing the completion of their third year of residency training, while the Plaintiff is unable to obtain any clinical rotations after her education was intentionally interrupted, effectively barring her from matching into OBGYN. This means the Plaintiff was on the verge of matching to residency in 2022, but the trajectory of this wrongful expulsion prevented her from matching and shattered her dream and career. The Plaintiff attributes her three-year delay to NYIT-COM's negligent administrative processes. In 2022, during her 4th year in NYIT-COM and after two years of clinical rotations, the year when the Plaintiff was supposed to graduate, she applied to 399 residency training programs. She was expected to match in one of the ten interviews, eight of them from obstetrics and gynecology residency interviews that she received. NYIT-COM intentionally expelled Plaintiff two days before the match result to prevent her from starting residency in case she matched in one of these interviews.  AC¶101-115.

After the expulsion, the Plaintiff's education was suddenly interrupted. She was cut from the office of residency training services intentionally to prevent her from getting any clinical rotations, which further hurt her chances to match in OBGYN. The Plaintiff secured a clinical rotation with Dr. F.N. at NYU as a volunteer. Dr. F.N. was pressured to drop her rotation and stop any research project with her. In addition, Dr. Genevive Sicuranza was very supportive of the Plaintiff before the expulsion, but after the non-ethical accusation, Dr. G.S. withdrew her recommendation letter from the applicant. Dr B.P., the internal medicine faculty at Long Island

6

Jewish Forest Hills, has also withdrawn her recommendation from the Plaintiff. Her application for hospital volunteering was not returned to her for undisclosed reasons. During this time, Plaintiff carried the burden of continuing her medical education by writing and publishing medical and scientific articles, publishing a medical review book for USMLE licensing exams, and publishing another book on obstetrics and Gynecology to maintain her medical education. The Plaintiff has also attempted to use her medical diploma to secure an OBGYN residency as an international medical graduate (IMG), but her expulsion from medical school discourages program directors from considering her. The Plaintiff has attempted to apply to several medical schools, but they have declined her application due to her expulsion records. The expulsion letter stated that the Plaintiff was expelled due to incidents during the clinical rotation. NYIT-COM characterized Plaintiff's conduct as "unprofessional." The school cannot use the word "unprofessional" unless explicitly mentioned in the evaluation reports by the preceptors. Notably, none of the Plaintiff's preceptors of the fourteen rotations have described her as "unprofessional." She was not in the Plaintiff's formal clinical evaluation reports, including the failed ones. Using the word "unprofessional" has unjustly harmed Plaintiff's professional reputation within the medical community. The Plaintiff has dedicated her entire life to academic medicine and has amassed an impressive clinical research and work resume, spanning 14 years of volunteering in clinical research and medical education, invested in NYIT-COM education, and carried $338,000.00 in student loans to secure her residency spot. To have Plaintiff's reputation tarnished by such a reckless action was devastating. After the Plaintiff's dismissal, she suffered a sudden interruption of her education, medical insurance, and academic progress. The Plaintiff was removed from any assistance from the NYIT-COM residency services office and was abandoned from education or academic access. The dismissal also prevented her from accessing clinical rotation through the

VSLO website, which is the only one accessible to American medical students. Unlike another unmatched student in her class, who was assisted by the residency services and received compensation during a transitional year or continued to participate in clinical rotations, the Plaintiff was not provided with any of these services, and her education was consequently interrupted. This disparity suggests discriminatory practices against Plaintiff. Deliberately expelling Plaintiff allowed the institution to avoid the costs of providing her a transitional year. Plaintiff met with the program director of General Surgery at a hospital in New York, who informed her that NYIT-COM should have provided her with a transitional year, as they had done for her classmates. Plaintiff's dismissal left her without income for two years after her dismissal. This decision had a profound impact on her clinical career. AC¶116-120.

The dean, Dr. Wadsworth, advised the Plaintiff to pursue an MBA immediately after expulsion. During the two years since her expulsion, she has attempted to secure clinical rotations or volunteer in hospitals, but none have accepted her, as hospitals have returned to the school for feedback. Additionally, the private clinical rotations are beyond her financial means; the hospital rejected her request due to her expulsion. The Plaintiff was able to volunteer in hospitals for five years before starting medical school, but she was unable to secure any rotations after NYIT-COM's intentional act of expulsion. Plaintiff has been accused of unethical misconduct regarding misinformation on Plaintiff's application, and her moral, professional character, and credibility have been permanently damaged. In addition, she has been financially harmed, as she was unable to secure a paid job for residency training and pay her student loan of $338,000, along with the accumulating interest of approximately $1,200 per month. Plaintiff has exhausted all internal administrative remedies prior to the commencement of this suit. ACl ¶116-125.

# ARGUMENT

## POINT I

### STANDARD OF REVIEW

Under the Federal Rules, a claimant must provide a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule 12 (b)(6), the court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor. See *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007). In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a Plaintiff must plead enough facts to state a claim to relief that is plausible on its face. See *Bell Atl Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A facially plausible claim is one where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 129 S. Ct. at 1950. In ruling on a motion to dismiss, a court may consider the facts asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 64 (2d Cir. 2010).

## POINT II

### PLAINTIFF HAS ALLEGED A PLAUSIBLE CLAIM FOR RELIGIOUS AND NATIONAL ORIGIN DISCRIMINATION

The Supreme Court has held that Title VI creates a private right of action to sue for intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). In order to establish a Title VI violation, a plaintiff must show, through specific factual allegations, that (1) the

9

defendant discriminated on a prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor for the defendant's action. OCR interprets the law to prohibit religious discrimination under Title VI if it is based on a group's actual or perceived: (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity. When considering a motion to dismiss under F.R.C.P. 12(b)(6), a court should draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Title VI of the Civil Rights Act of 1964 further provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

In the case at hand, Plaintiff has pleaded a plausible cause of action for discrimination based on her national origin and religion as follows:

### 1. Plaintiff Alleges Discrimination On A Prohibited Basis: Religion And National Origin

Title VI bars discrimination on the basis of national origin. Federal agencies interpret this prohibition to also cover certain forms of religious discrimination, specifically when it is based on a group's "actual or perceived: (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity." Id. Here, Plaintiff has alleged that she was a practicing Muslim and of Egyptian descent, which she pleads NYIT-COM perceived as intertwined religious and ethnic identities (ACl. ¶¶ 2, 6, 11, 26, 47, 128–131). She further alleges that she was expelled and targeted in ways not experienced by non-Muslim, non-Middle Eastern students (id. ¶¶ 50–53, 109–112). These allegations, viewed in the light most

favorable to the Plaintiff fall within the prohibited grounds recognized under Title VI and thus, dismissal cannot be granted.

### 2. The Amended Complaint Alleges That The Discrimination Was Intentional

The Amended complaint details numerous instances of deliberate, disparate treatment that, taken together, plausibly show that Plaintiff was expelled due to discriminatory animus. Specifically, Plaintiff identifies a pattern in which other Muslim, Middle Eastern students at NYIT-COM (Egyptian, Pakistani, Syrian) were subjected to disproportionate disciplinary measures compared to similarly situated non-Muslim students (AC ¶¶ 50–53, 111–112).  In addition, Plaintiff was expelled for conduct, such as failing a clinical rotation, that allegedly did not lead to dismissal for others, and in violation of NYIT-COM's own handbook (AC ¶¶ 78–85).  For instance, a classmate allegedly encouraged Plaintiff to convert to Christianity and called Islam an "evil religion" (AC ¶ 57), and after her expulsion, Plaintiff received an anti-Muslim book (AC ¶ 43).  Further, Plaintiff alleges that a faculty member allegedly told Plaintiff to "return to Egypt where you came from" (AC ¶ 104), which is a direct expression of discriminatory intent based on national origin.  Moreover, School officials allegedly admitted that the decision to expel her came from "higher authorities" and was necessary to protect the institution's reputation, suggesting a pretext for a discriminatory motive (AC ¶¶ 41, 64, 106).  These facts plausibly allege that Plaintiff's expulsion was not based solely on legitimate academic or conduct concerns, but rather was animated, at least in part, by animus toward her religious and national background, and thus, because Plaintiff has met her burden, the motion to dismiss should be denied.

### 3. Plaintiff Alleges That Her Religion And National Origin Were Motivating Factors In The Adverse Action

Title VI requires that the discrimination be a "substantial or motivating factor" for the defendant's actions. *Alexander*, id.  Plaintiff alleges that she was performing satisfactorily in her

academic program and had met graduation requirements before her abrupt dismissal two months prior to graduation (AC. ¶¶ 13–14, 78–80). She also alleges that similarly situated non-Muslim students who faced similar or worse conduct issues were allowed to graduate (AC. ¶¶ 81–85, 97–99). Crucially, Plaintiff explicitly links the timing and content of her disciplinary proceedings to her prior statements about discrimination in Southern residency programs and to her perceived Middle Eastern and Muslim identity (AC. ¶¶ 47–49, 66, 106, 109). Her allegations, taken as true at this stage, give rise to a plausible inference that her religion and national origin were motivating factors in the decision to dismiss her from the medical program.

### 4. Plaintiff Was Dismissed For Minor Offenses, And It Was Evident That Her Dismissal Was Due To Discrimination And Retaliation

Plaintiff has pleaded that at NYIT-COM, most Muslim students who sought surgical specialties of Middle Eastern descent face more disciplinary actions than the other students, especially Pakistani, Syrian, and Egyptian female students. Upon information and belief, students U., A.A., Y.A., M.A., S.A., and Y.E. have been subjected to disparate treatment based on their religion and Middle Eastern ancestry, as set forth below. (AC ¶¶ 47 and 50) Christian students had more favorable treatment than Muslim Egyptians. For example, unlike Plaintiff, M.A., Y.T., G.Y., M.A., and P.S. were helped to reach their goals even if they showed lower academic progress. (AC ¶ 51) P.S. failed the UMSLE six times prior to admission to NYIT-COM. However, the school helped him overcome his difficulties, and he graduated and is now in residency training. In contrast, the school does not extend the same level of forgiveness and support to Muslim students, as demonstrated clearly in Plaintiff's case. (AC ¶ 51) For instance, in 2012, NYIT-COM expelled Middle Eastern Egyptian Muslim surgeon Ahdy Attallah. In 2020, NYIT- COM expelled Muslim Pakistani student S.S. despite his excellent grades in all his classes. (AC ¶ 52) By contrast, American non-Muslim medical students who committed egregious misconduct, such as cheating

on exams, sexual harassment, or academic struggles, were allowed to graduate, but Muslim students were closely monitored and expelled for less serious infractions. A.S., one of the NYIT-COM ambassadors, informed the Plaintiff that NYIT-COM was lenient with other students compared to her. Student A.Z. was reported for sexual harassment, and NYIT-COM took some disciplinary action against him but did not expel him. Student M.K. struggled academically and failed the MTOM-813 course, but he was offered remediation to retake the test and graduated.

Here, Plaintiff was dismissed for minor offenses during two clinical rotations that should not have resulted in expulsion. (AC ¶ 55-59). Dr. William Blazey, Vice Dean of NYIT-COM, made a troubling statement: "NYIT-COM will not be able to graduate any more students if we did not expel this student," reflecting a bias. Despite not having direct professional interaction with the Plaintiff, Dr. Catherine Caronia, serving as the Chief Academic Officer of the Catholic Health System and the chairman of the GME office of Good Sam Hospital, reported minor infractions to NYIT-COM 's Dean, Dr. Wadsworth, such as a failure to return ID badges, absence on President's Day due to a medical emergency, and described her emails requesting letters of recommendation as stalking. The Catholic Health System informed the Plaintiff that "the Plaintiff is not welcomed on any of their rotation sites." (AC ¶ 61). The Plaintiff was subsequently referred to an ethical committee for minor infractions, resulting in wrongful censure by the vice president (AC ¶ 68), "Dr. Jerry Ballentine." These minor infractions did not signify intentional defiance or disregard for protocol. A draconian punishment of wrongful censure for these infractions caused the Plaintiff's expulsion and cost her career. These concerns could have been addressed through counseling, guidance, and institutional support mechanisms instead of censure, which caused Plaintiff's expulsion after Cedar Sinai failed her rotation. (AC ¶ 68) Furthermore, Plaintiff was treated less favorably compared to Christian American classmates at the same rotation of the

13

Catholic Health System. (AC ¶ 69) For instance, in February 2018, during her clinical rotation of emergency medicine at St Joseph Hospital of the Catholic Health System, a Christian American classmate named "Anjalica" arrived late for her schedule, but the Chief Academic Officer of Catholic Health did not report Anjalica to the Dean of the NYIT-COM and did not face any ethical meetings, unlike Plaintiff. This discrepancy shows discriminatory treatment within the Catholic Health system that cost the Plaintiff her medical career. (AC ¶ 70) In typical circumstances, students experiencing difficulties during a rotation are informed of weaknesses and provided with remediation options to address these issues. (AC ¶ 73) In the Plaintiff's case, however, no such remediation was offered, and no concerns were raised about the Plaintiff's performance during the rotation. (AC ¶ 74) Failing Plaintiff without remediation reflects a deviation from the standard protocol and the due process of AAMC clinical evaluation. (AC ¶ 75) According to standard protocol, a preceptor must initiate remediation procedures, document identified weaknesses, and provide the student with time to improve. However, no remediation was initiated during the rotation, so the preceptor had no right to fail her after she left the hospital. (AC ¶ 76) .

Plaintiff was expelled just two months before graduation despite completing her graduation requirement, but for non-expellable offenses: two clinical rotations that were not significant infractions that were nonclinical, and the penalty was grossly disproportionate to the offense per NYIT-COM policy. (AC ¶ 80) The Plaintiff's expulsion was unjustified, particularly when considering that other students who failed rotations did not face similar consequences. Another classmate failed rotations yet was not expelled from NYIT-COM, which reflects disparate treatment based on the Plaintiff's religion and national origin. (AC ¶ 81) Upon information and belief, NYIT-COM had been lenient with other students, such as a student who is non-Egyptian and non-Muslim, A.Z., who was reported for sexual harassment and subjected to disciplinary

14

action, but NYIT-COM did not expel him. (AC ¶ 83) Student H.W. was reported for cheating on the exam and having academic delays due to not providing the COMLEX exam on time. He was treated with leniency and not expelled. (AC ¶ 84) Moreover, the admission dean, Mr. Mary Ann Achtziger, falsely accused Plaintiff of providing misinformation on her medical school application. (AC ¶ 86) Regarding the false allegation of the Plaintiff, the school claimed that the admission department was not informed about the prior 3 months of residency in 2016. (AC ¶ 90 of 2) However, Plaintiff disclosed her prior residency on seven occasions. (AC ¶ 91) After the expulsion, a faculty member, Felecia Bruno of the Ethical Committee, told the Plaintiff, "Return to 'Egypt' where you came from," referring to the Plaintiff's national origin and religion, a blatant ethnic slur. (AC ¶ 104) .Upon information and belief, Muslim students were systematically assigned to non-hospital settings, office-based rotations, or hospitals lacking residency programs, which impaired their chances of securing desirable residency placements. In contrast, non-Muslim students were often assigned rotations in hospitals with established residency training programs, providing greater exposure to networking opportunities and experience that can improve match outcomes. This discrepancy led to lower match rates for Muslim students in competitive or categorical specialties. Muslim students, such as Mohammad Yasin, Iffat Adeel, Tamzid Hassan, and Umme Romana, reportedly struggled to secure categorical spots, often needing to accept preliminary or transitional-year positions. Meanwhile, others, including the Plaintiff and Anjum Kazi, did not match at all. (AC ¶ 109) The Plaintiff was scheduled for rotations at Catholic Health System sites, including St. Catherine of Siena for surgery, St. Joseph Hospital for emergency medicine, and Mercy Hospital for internal medicine, all lacking residency programs. This, she asserts, limited her ability to build connections essential for matching into a categorical residency. (AC ¶ 110) .

15

Therefore, in the case at hand, the amended complaint pleads facts that satisfy all elements required to state a Title VI discrimination claim and gives specific examples of how Plaintiff's dismissal was due to discrimination and retaliation. The allegations are not speculative or conclusory, but instead are detailed, specific, and substantiated with factual support. Under the standards articulated in *Ashcroft v. Iqbal* and *Alexander v. Sandoval*, the complaint plausibly alleges that Plaintiff was intentionally discriminated against on the basis of religion and national origin, and that this discrimination was a motivating factor in her dismissal from NYIT-COM. In addition, all the facts should be viewed in the light most favorable to the Plaintiff.  *Iqbal*, id. Therefore, Plaintiff has properly stated a claim for relief under Title VI, and the motion to dismiss should be denied.

## POINT III

**PLAINTIFF HAS ADEQUATELY PLEADED RETALIATION UNDER TITLE VI**

In the case at hand, Plaintiff has pleaded facts that support a plausible claim for retaliation under Title VI**,** satisfying the standard under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and consistent with the principles recognized in *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).  As NYIT concedes, "courts have generally construed [Title VI] as creating an implied private right of action for retaliation." See *Bloomberg v. New York City Dept. of Educ.*, 410 F. Supp. 3d 608, 624 (S.D.N.Y. 2019)(quoting *Palmer v. Penfield Cent. Sch. Dist*., 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013) (collecting cases).

Under this framework, to state a claim for retaliation, a plaintiff must allege (1) Protected activity under Title VI; (2) Adverse action by the defendant; and (3) A causal connection between the protected activity and the adverse action.  Plaintiff's allegations, when taken as true and viewed in the light most favorable to her, satisfy all three elements. Id.

### 1. **Plaintiff Engaged In Protected Activity**

Plaintiff's protected activity includes her prior complaints and lawsuits about racial and national origin discrimination in residency programs in the Southern U.S. (ACl. ¶¶ 20–21, 28, 47–49). In addition, Plaintiff complained and spoke out about systematic bias against international medical graduates (IMGs), Muslims, and Middle Eastern students (¶¶ 47–50, 111–112), and her inquiries and complaints to senior figures in the medical education establishment, such as the ACGME, regarding unjust treatment (¶¶ 6, 19, 29–30, 40). This conduct constitutes protected activity under Title VI, which prohibits not only direct discrimination but retaliation for opposing discriminatory practices. See *Bloomberg, et al,* id.

### 2. **Plaintiff Suffered Adverse Action**

In her Amended Complaint, Plaintiff alleges that she was expelled from NYIT-COM two months before graduation—an undeniably severe adverse action that ended her candidacy for medical licensure in the U.S., caused her loss of match opportunities in multiple residency cycles (¶¶ 37, 113–116), led to public defamation, including being labeled "unprofessional" and accused of academic misconduct (¶¶ 117–120), and resulted in financial, reputational, and emotional damages (¶¶ 124–125, 133). The timing and content of this expulsion, following her protected speech, raise a strong inference of retaliatory motive. See *Bloomberg, et al,* id.

Thus, her allegations meet her burden to withstand a motion to dismiss.

### 3. **The Complaint Pleads A Causal Connection**

The amended complaint includes numerous factual allegations showing a causal link between Plaintiff's protected activity and NYIT-COM's retaliatory conduct. See *Bloomberg, et al,* id. Here, the disciplinary proceedings began immediately after Plaintiff disclosed her prior expulsion and raised concerns about healthcare disparities affecting Muslim and Middle Eastern

IMGs (¶¶ 47–48).  In addition, Plaintiff was expelled following coordination between NYIT-COM and external parties (such as the ACGME and Southern hospitals) with vested interests in silencing her complaints (¶¶ 28–30, 39–41).  Further, Multiple mentors admitted that her dismissal came from "higher authorities" who were allegedly retaliating for Plaintiff's past lawsuits and advocacy (¶ 41).  NYIT-COM repeatedly offered Plaintiff "deals" to quietly withdraw from the program (¶¶ 38, 42), and upon her refusal, proceeded to expel her. Plaintiff was subsequently blocked from clinical rotations and stripped of institutional support (¶¶ 113–116), which she had previously used to advocate for marginalized IMGs.

These factual allegations, taken together, give rise to a plausible inference that Plaintiff was expelled in retaliation for speaking out about discriminatory practices against Muslim and Middle Eastern IMGs.

Moreover, Defendant asserts that the retaliation claim should be dismissed because Plaintiff failed to explicitly label it as such and has not stated it with sufficient specificity. This argument fails for several reasons.  First, under the federal pleading standards, Plaintiff is not required to name every legal theory so long as the facts support a claim.  See *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) ("Federal pleading rules call for 'a short and plain statement of the claim,' not an exposition of a legal theory.").  In addition, the Amended complaint repeatedly references retaliation (e.g., ¶¶ 21, 28, 34, 40, 47) and details the circumstances linking Plaintiff's protected activities to the timing of her expulsion.  The Second Circuit has long held that retaliation claims under Title VI are cognizable and that retaliatory acts need only be plausibly inferred from the factual narrative. See *Blum v. Schlegel*, 18 F.3d 1005 (2d Cir. 1994); *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013).

18

Therefore, Plaintiff has plausibly alleged that she engaged in protected activity by speaking out against discriminatory practices. She suffered adverse educational and professional consequences as a result, and there was a causal link between the two, substantiated by both the timing and the coordinated actions of NYIT-COM and external actors. As such, dismissal of the Title VI retaliation claim is unwarranted under the standards of *Ashcroft v. Iqbal* and the facts alleged in the complaint. Thus, this claim should be allowed to proceed.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's motion to dismiss and grant any other relief that this Court deems appropriate.

Dated: New York, New York
      May 19, 2025

STEWART LEE KARLIN
LAW GROUP, P.C.

*s/ Natalia Kapitonova*
Natalia Kapitonova, Esq.
*Attorneys for Plaintiff*
111 John St., 22nd Floor
New York, NY 10038
(212) 792-9670
cnk@stewartkarlin.com