UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARWA BADR,

                   Plaintiff,

-against-

NEW YORK INSTITUTE OF TECHNOLOGY,
NYIT-COM COLLEGE OF OSTEOPATHIC
MEDICINE,

                   Defendant.
----------------------------------------------------------X

**Case No.: 24-CV-05333 (JMA)(JMW)**

### PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE'S REPORT AND <u>RECOMMENDATION GRANTING DEFENDANT'S MOTION TO DISMISS</u>

### PRELIMINARY STATEMENT

Plaintiff, MARWA BADR, respectfully requests the Court to review and reverse the Magistrate's Report and Recommendation ("R&R") granting Defendant's Motion to Dismiss.

### BACKGROUND INFORMATION[1]

Plaintiff Marwa Badr (a/k/a Sarah Adam) was a fourth-year medical student at NYIT-COM College of Osteopathic Medicine (hereinafter "NYIT-COM") who, due to discriminatory practices against her, was unable to graduate and obtain her degree even though she completed almost all of the required courses. Plaintiff is a Muslim student of Middle Eastern descent (Egyptian), and her religion is Islam. In 2018, she enrolled in the Emigre Physicians Program (EPP) at NYIT-COM, which admits 38 international medical graduates. (AC ¶¶ 9-12)

Plaintiff is an Egyptian doctor. She completed seven years of medical school in Egypt with honors, followed by a four-year obstetrics and gynecology residency training program in Egypt, during which she performed approximately 5,000 vaginal deliveries, 600 cesarean sections, and other gynecologic surgeries, and authored fifteen scientific

---

[1] The Court is respectfully referred to the Amended Complaint ( Dkt. No. 19), referred hereinafter as "AC", for additional facts and circumstances regarding the Plaintiff's dismissal.

publications in women's reproductive health. Upon immigrating to the United States of America, Plaintiff volunteered as a clinical research fellow and shadowed in clinics for four years, from 2011 to 2015, at Augusta University and the University of South Alabama. Plaintiff was wrongfully dismissed from the residency in retaliation for raising her concerns regarding a toxic, discriminatory work environment in her previous residency. Plaintiff was advised to apply to an American Medical School because, as a foreign doctor, to enhance her chances of matching into a competitive surgical specialty such as obstetrics and gynecology (OBGYN), as applies to all international medical graduates (IMG), she will not be able to match. Plaintiff then applied and was accepted to NYIT-COM. Over the course of four years, Plaintiff fulfilled all graduation requirements and was two months away from completing her American degree when she was expelled in March of 2022. (AC ¶¶ 9-14). On March 22, 2022, Plaintiff was dismissed from NYIT-COM after completing 4 years of medical graduation requirements. *Id.*

1.    **Religious And National Origin Discrimination**

Plaintiff asserts that her expulsion from NYIT College of Osteopathic Medicine (NYITCOM) was a retaliatory act tied to her earlier legal actions against her former employer, Mercer University, where she was dismissed in 2016 after reporting a toxic and discriminatory residency environment. She contends that her long-standing efforts to pursue a medical career have been consistently impeded by discriminatory practices targeting international medical graduates (IMGs) and Muslim physicians, particularly women of Middle Eastern descent.

Plaintiff highlights several key events to support her claim:

a.    **Discriminatory Exclusion from Southern Residency Programs**

Despite volunteering for two years at the University of South Alabama and Augusta University, Plaintiff was repeatedly denied acceptance into residency training programs in the South. These rejections, she alleges, were not merit-based but reflective of systemic bias against IMGs and Muslims seeking entry into surgical specialties. (AC ¶¶ 17-22)

b.    **Retaliatory Dismissal from Mercer University Residency**

After enduring bullying and harassment by a senior resident during her OB/GYN residency at Mercer's Navicent

Health in Georgia, Plaintiff was dismissed following what she believes was a flawed and biased internal investigation. This dismissal was allegedly based on a malicious and unsubstantiated accusation, without affording her due process. (AC ¶¶ 20-21)

    **c.**    **False Criminal Allegations and Legal Repercussions**

Following her dismissal, the medical center allegedly initiated false legal claims against Plaintiff, resulting in her wrongful arrest in 2017 and prolonged legal proceedings in Bibb County, Georgia. She incurred significant financial and emotional hardship while defending herself and ultimately clearing her name. (AC ¶ 91(1))

    **d.**    **Blocked Civil Rights Litigation**

Plaintiff filed a civil rights lawsuit in 2016 in Mississippi to seek redress for wrongful dismissal and retaliation. However, the case was dismissed on procedural grounds after being transferred to Georgia and missing the statute of limitations by one day—effectively denying her access to a meaningful legal remedy. (AC ¶ 91)

Despite these setbacks, Plaintiff persevered and was admitted to NYITCOM in 2018, which she credits as a second chance. However, she now believes that NYITCOM failed to conduct proper due diligence prior to her admission and retaliated against her after discovering her prior legal actions. Rather than supporting her progression, NYITCOM expelled her in 2022—just two months before graduation—effectively cutting off her pathway to residency and preventing her from advancing in her medical career.

    **i.**    **Retaliation Based on Prior Civil Rights Litigation**

Plaintiff alleges that her expulsion from NYIT College of Osteopathic Medicine (NYITCOM) was not based on academic or clinical deficiency but was instead a retaliatory action taken in response to her 2016 civil rights lawsuit against Mercer University, where she challenged a wrongful dismissal after reporting a hostile work environment during her OB/GYN residency. (AC ¶ 49)

Importantly, the disciplinary proceedings at NYITCOM were initiated only after Plaintiff disclosed her past residency experience during her clinical rotation at Catholic Health System. This timeline supports the inference that her

prior protected activity was a motivating factor in NYITCOM's decision to expel her, thereby establishing a basis for retaliation under Title VI. (AC ¶ 49)

### ii.    Financial Motive and Institutional Bias

Plaintiff further alleges that her expulsion occurred under circumstances suggesting a potential financial or institutional incentive aligned with NYITCOM's interests. Specifically, NYITCOM initiated formal disciplinary proceedings against Plaintiff in or around November 2021, during the same period the institution was approved for an approximately $1.8 million NIH grant funded by the U.S. Department of Defense. Plaintiff respectfully submits that the Court should examine the timing and sequence of events surrounding this funding as potentially relevant context. The grant was officially awarded in December 2021, and Plaintiff alleges that the funds were fully released only after NYITCOM denied her reinstatement request in 2023—her final opportunity under school policy to obtain her earned medical degree. (See AC ¶¶ 44)

Plaintiff was informed by one NYITCOM mentor that there was "external pressure" to expel her, and another faculty member reportedly stated, "If we reinstate her, we won't be able to graduate any other students." These internal remarks raise serious questions about undue influence and whether the school's decision to expel Plaintiff was driven, in part, by a desire to protect its institutional relationships and financial incentives, rather than by applying neutral academic standards. (AC ¶¶ 31-39, 44)

In this context, the decision to expel Plaintiff after she completed four years of coursework, passed her clinical rotations, and met graduation requirements reflects both retaliatory intent and a conflict of interest rooted in grant-related incentives and external influence from affiliated hospital systems. The Catholic Health System, which reported minor infractions against the Plaintiff, was also involved in the clinical network that directly benefited from NYITCOM's graduate placement efforts. (AC ¶ 44)

The continuous obstruction of her medical career—ranging from wrongful dismissal, harassment, institutional exclusion, and expulsion shortly before graduation—has not been isolated or coincidental. Rather, Plaintiff believes it

constitutes a pattern of coordinated actions across state lines, involving misuse of federal resources and suppression of her civil rights under the color of law. (See AC ¶¶ 31-39,44)

This pattern of retaliation, financial incentive, discrimination, and coercion—tied to Plaintiff's protected legal activity and minority status—has inflicted long-term damage on her livelihood and must be investigated thoroughly. Plaintiff urges the Court to allow this matter to proceed to discovery and trial, where these complex and grave allegations can be fully explored. (See AC ¶¶ 119-120,122)

### iii.    NYITCOM Wrongful Expulsion and Discriminatory Practices

Plaintiff alleges NYIT-COM's internal ethics investigation was biased, procedurally unfair, and structurally conflicted, leading to her wrongful expulsion. She argues the ethics committee acted improperly by voting to expel her without reviewing key missing documents (including allegedly deleted emails and a letter of recommendation), and that the committee lacked independence because all members were NYIT-COM employees. Plaintiff further claims that the final committee was improperly composed of non-clinicians who lacked the clinical expertise to evaluate hospital-related incidents and that the committee violated due process by refusing to meet with her, resulting in an abrupt and unjust decision. She also asserts NYIT-COM's expulsion letter effectively admitted the decision was based on disputed clinical incidents, yet the school refused to correct or remove those charges.

Additionally, Plaintiff alleges she was disadvantaged by assignment to rotation sites without residency programs, which limited her networking and residency-match opportunities relative to her peers. She claims this unequal placement and subsequent treatment—including a faculty member allegedly telling her to "return to Egypt"—supports discrimination based on national origin and religion, and that NYIT-COM intentionally excluded her from institutional support and residency guidance across multiple match cycles despite her prior good academic standing.

Plaintiff alleges that non-Muslim students received substantially greater academic support, accommodations, and favorable treatment than Egyptian Muslim students, even when non-Muslim students struggled academically (See AC ¶¶ 101–105).

For example, Plaintiff states that Peter Sorial, despite failing the USMLE multiple times and failing his first year at NYIT-COM, was afforded support that enabled him to graduate and enter residency. Plaintiff alleges that other non-Muslim students similarly benefited from a supportive environment that helped them succeed and match into residency, while Muslim students did not receive the same level of understanding, assistance, or forgiveness.

Plaintiff further alleges that Muslim students were systematically disadvantaged in clinical rotation assignments, often being placed in non-hospital or office-based settings or in hospitals without residency programs, which reduced their ability to network, obtain strong evaluations, and improve residency match outcomes. In contrast, Plaintiff claims non-Muslim students were more frequently assigned to hospitals with established residency programs, giving them stronger exposure and connections that improve match chances. Plaintiff asserts this unequal access contributed to lower match rates for Muslim students, especially in competitive or categorical specialties, with some Muslim students reportedly forced into preliminary or transitional positions, while others—like Plaintiff—did not match at all.

Additionally, Plaintiff alleges a pattern of disproportionate disciplinary scrutiny against Muslim students, particularly those expressing interest in competitive or surgical specialties, which further harmed residency prospects. Plaintiff claims Muslim students were more likely to face disciplinary proceedings that could damage their records, while non-Muslim students with similar or weaker performance were not targeted at the same level. Finally, Plaintiff alleges she personally was assigned core rotations at sites with no affiliated residency programs, including Catholic Health System facilities (St. Catherine of Siena, St. Joseph Hospital, and Mercy Hospital), limiting her ability to connect with residency decision-makers compared to non-Muslim peers (See AC ¶¶ 106–111).

After her expulsion, Plaintiff applied to numerous Obstetrics and Gynecology residency programs across two ERAS application cycles (2023 and 2024) but received no interviews, despite having secured ten interviews in 2022 before the expulsion. She alleges that the expulsion and NYITCOM's refusal to remove the "non-ethical" charges from her expulsion letter compelled her to disclose damaging allegations nationwide in residency applications, resulting in reputational harm and effectively blocking her career progression. Plaintiff states that program directors informed her

that they could not proceed without her NYITCOM medical diploma. Although she received an offer from the University of Mississippi, the offer was later withdrawn because her diploma remained unreleased.

Plaintiff further alleges that she was on the verge of matching into residency in 2022—having applied to and completed interviews, including multiple OBGYN interviews—but NYITCOM expelled her two days before Match results were released, which she claims intentionally interfered with her professional advancement and caused severe emotional harm. She asserts that, unlike her classmates, who have successfully matched and are now nearing completion of their third year of residency, she has been unable to secure training opportunities and has suffered a multi-year delay as a result of NYITCOM's actions.

Plaintiff also alleges that following the expulsion, she was cut off from residency support services and blocked from securing clinical rotations, and that physicians who initially supported her (including those who offered rotations, research opportunities, and recommendation letters) later withdrew support due to pressure and the stigma of the expulsion. Despite these barriers, she continued her medical education independently by publishing scientific articles and medical books, but contends that her disciplinary record continues to prevent her from obtaining rotations, matching into residency, or transferring to other medical schools.

Plaintiff alleges that NYIT-COM continued hostile conduct against her after her dismissal by labeling her as "unprofessional" based on a previously raised admissions-application oversight allegation that was later cleared. Plaintiff contends that the school wrongfully refused to remove these unethical accusations, thereby forcing her to disclose them in every residency application, resulting in nationwide reputational harm and defamation. She asserts that the school lacked justification for using the term "unprofessional" because none of her preceptors across fourteen clinical rotations—including failed rotations—ever described her in that manner in formal evaluation reports.

Plaintiff further alleges that NYIT-COM's actions severely damaged her professional standing despite her longstanding dedication to academic medicine, extensive clinical research background, and significant financial investment in her education, including $338,000 in student loans. After dismissal, she alleges that her education and

medical insurance were abruptly interrupted and that she was cut off from residency services and academic support. She also alleges she was denied access to VSLO rotation opportunities, while other unmatched classmates received transitional-year support, continued rotations, or compensation—suggesting discriminatory treatment and financial motivation by the institution to avoid supporting her.

Plaintiff states that the expulsion left her unable to secure rotations, volunteer opportunities, or employment for two years, thereby worsening her financial hardship due to loan interest, high living costs, and depleted savings. She also alleges that school leadership pressured her to abandon medicine by advising her to pursue an MBA without a clear explanation. Plaintiff asserts she exhausted internal administrative remedies before filing suit and seeks relief for the lasting professional, emotional, and financial harm caused by NYIT-COM's continued actions.

### iv.    Involvement of NYU in the Harassment

Before her expulsion, in 2022, Plaintiff alleges she was admitted to NYU's emergency department after losing consciousness due to a hypoglycemic episode, and that standard medical protocols were not properly followed. She contends that unrelated and stigmatizing laboratory tests—such as syphilis and hepatitis screening—were ordered without clinical justification, without her informed consent, and contrary to accepted guidelines for evaluating loss of consciousness. Plaintiff asserts these actions contributed to a broader pattern intended to harm her credibility and professional reputation. (See AC ¶ 116)

After her expulsion, Plaintiff alleges she faced repeated rejection and a lack of response from NYU-affiliated medical positions despite submitting numerous applications. She further states that even after personally visiting NYU Langone Health in Minneola and meeting with Dr. Sicuranza to submit her résumé for any clinical opportunity, she was never contacted. Plaintiff believes this reflects institutional blacklisting designed to prevent her return to clinical practice. (See AC ¶ 116)

Plaintiff also alleges that Dr. F.N., an NYU-affiliated gynecologic oncologist, offered her a voluntary academic position during which she contributed to research and produced a publishable manuscript, but that NYU leadership later

pressured him to end professional ties with her and refrain from publishing the work under NYU affiliation. Plaintiff believes this was retaliatory and intended to suppress her academic progress. (See AC ¶ 116)

Finally, Plaintiff claims that after filing her federal lawsuit in July 2024, she experienced a pattern of cyber-related privacy concerns and harassment, including suspicious Wi-Fi activity near her home, increased police encounters, alleged interference with communications, and incidents suggesting surveillance or being followed. She reports filing a formal complaint with the New York State Attorney General's Office (Nassau County Division) on October 21, 2024 (Complaint No. 990908-24), as well as experiencing mail tampering, and alleges these events reflect intimidation and retaliation following her pursuit of legal relief. (See AC ¶¶ 119, 120, 122)

## THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The Report and Recommendation held that Plaintiff fails to allege any facts supporting an inference of intentional discrimination based on national origin or any "intertwined" identity. (Dkt 34 pg. 8) Plaintiff objects to this finding for the reasons set forth below.

The Report and Recommendation further held that Plaintiff provides no direct or statistical evidence that similarly situated non-Muslim students were treated more favorably, nor does she identify any specific incidents demonstrating disparate treatment. (Dkt 34 pg. 9) Plaintiff objects to this finding for the reasons set forth below.

Plaintiff's speculation that disciplinary decisions stemmed from discriminatory animus, rather than legitimate academic or professional considerations, is insufficient. Plaintiff argues that she has plausibly alleged intentional discrimination based not solely on religion, but also on national origin, stating an alleged pattern of disproportionately harsh disciplinary measures against Muslim and Middle Eastern students (e.g., Egyptian, Pakistani, Syrian) at NYIT-COM compared to non-Muslim students. She further contends that her "shared ancestry and ethnic characteristics from Egypt," where "Islam is the dominant religion or distinct religious identity," support her claim by demonstrating between her religion and national origin. Yet Plaintiff advances no facts suggesting that NYIT-COM's actions were actually motivated by her religion or her national origin, rather than legitimate concerns regarding performance and

9

professionalism. Plaintiff's assertion that NYIT-COM perceived her religion and ethnicity as intertwined does not transform a religion-based claim into one actionable under Title VI, particularly absent factual allegations or legal authority showing that the school's actions were motivated by her national origin or religion. (Dkt 34 pgs. 11-12) Plaintiff objects to this finding for the reasons set forth below.

Essentially, all that he has alleged is that he engaged in protected activity at one time and that an adverse action occurred later. Therefore, Plaintiff's assertion that there is a causal connection is without merit. Plaintiff's Complaint does not explicitly assert a retaliation claim under Title VI. Thus, a retaliation claim under Title VI, if pled properly, would also lead to a recommendation of dismissal for failure to state a claim. (Dkt 34-pg 14) Plaintiff objects to this finding for the reasons set forth below.

## ARGUMENT

### POINT I

#### THE MAGISTRATE'S REPORT AND RECOMMENDATION (R&R) SHOULD BE REVIEWED DE NOVO

Objections to a magistrate's report let the district judge focus on key factual and legal issues in the dispute. *Thomas v. Arn,* 474 U.S. 140, 147 (1985). The Federal Magistrates Act requires a district court to conduct "a de novo determination *of those portions* of the [magistrate judge's] report or specific proposed findings or recommendations to which objection is made." 28 U.S.C.A. § 636(b)(1) (West 1993 & Supp. 2005); *see also* Fed. R. Civ. P. 72(b) ("The district judge shall make a de novo determination upon the record, or after additional evidence, *of any portion* of the magistrate judge's disposition to which *specific written objection has been made*...").

When a party objects to a magistrate judge's report on a dispositive motion, a district court must identify which parts are subject to de novo review. De novo review means the court examines the case from the same perspective as the district court, as if no previous decision was made. Review is independent and plenary, with no deference to the district court. See *Camardo v. General Motors Hourly-Rate Employees Pension Plan,* 806 F.Supp. 380 (1992); *Lawrence v. Dep't of Interior,* 525 F.3d 916, 920 (9th Cir. 2008); *Lewis v. United States,* 641 F.3d 1174, 1176 (9th Cir. 2011); *Freeman*

*v. DirecTV, Inc.,* 457 F.3d 1001, 1004 (9th Cir. 2006); *Agyeman v. INS,* 296 F.3d 871, 876 (9th Cir. 2002); *Stilwell v. Smith & Nephew, Inc.,* 482 F.3d 1187, 1193 (9th Cir. 2007); *United States v. Waites,* 198 F.3d 1123, 1126 (9th Cir. 2000); *Barrientos v. Wells Fargo Bank, N.A.,* 633 F.3d 1186, 1188 (9th Cir. 2011); *Ditto v. McCurdy,* 510 F.3d 1070, 1075 (9th Cir. 2007); *Rabkin v. Oregon Health Sciences Univ.,* 350 F.3d 967, 971 (9th Cir. 2003). In light of these principles, Plaintiff respectfully asserts that each objection submitted herein qualifies for de novo review by this Honorable Court. The objections are detailed, factually grounded, and raise substantial questions of federal law, procedural fairness, and constitutional rights. Plaintiff further requests that the Court consider the need for additional factual development, including discovery, to properly adjudicate the claims raised.

**POINT II**

**APPLICABLE STANDARDS REGARDING A MOTION TO DISMISS**

Plaintiff further objects to the recommendation for dismissal by reiterating that her Amended Complaint satisfies the federal pleading standards set forth in Federal Rule of Civil Procedure 8(a) and interpreted by controlling precedent. Under Rule 8, a pleading need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. See *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). To survive such a motion, a complaint need only allege facts sufficient to state a claim that is plausible on its face. See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Further, where factual allegations are well-pleaded, the court must assume their veracity and determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679. The court's analysis is confined to the "four corners" of the complaint, as well as documents attached as exhibits or incorporated by reference. See *Peter F. Gaito*

*Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).

In this case, Plaintiff's Amended Complaint contains extensive factual allegations, supported by specific incidents, dates, named individuals, documentary evidence, and contextual background, all of which meet or exceed the plausibility threshold. At a minimum, these allegations warrant discovery, and dismissal at the pleading stage is both premature and inconsistent with Rule 12(b) (6) standards.

## POINT III

### THE REPORT AND RECOMMENDATION ERRED BECAUSE PLAINTIFF HAS ALLEGED A PLAUSIBLE CLAIM FOR RELIGIOUS AND NATIONAL ORIGIN DISCRIMINATION

The report and recommendation incorrectly concluded that the plaintiff had not presented a plausible claim of discrimination on the basis of religion or national origin. The Supreme Court has established that Title VI confers a private right of action to pursue claims of intentional discrimination. See *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). To substantiate a violation of Title VI, a plaintiff must demonstrate, through specific factual allegations, that (1) the defendant engaged in discrimination on a prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor behind the defendant's actions.

The Office of Civil Rights further interprets the law to prohibit religious discrimination under Title VI when it is based on a group's actual or perceived: (i) shared ancestry or ethnic characteristics; or (ii) citizenship or residency in a country with a dominant religion or distinct religious identity. When evaluating a motion to dismiss pursuant to F.R.C.P. 12(b)(6), a court must draw all reasonable inferences in favor of the Plaintiff, assume all well-pleaded factual allegations to be true, and assess whether they plausibly establish an entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Title VI of the Civil Rights Act of 1964 additionally stipulates that "[n]o individual within the United States shall, on the basis of race, color, or national origin, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

In the present case, the Plaintiff has articulated a credible cause of action alleging discrimination on the grounds of her national origin and religion as follows:

12

### 1.    Plaintiff Claims Discrimination Based on Religion and National Origin

Title VI prohibits discrimination on the basis of national origin. Federal agencies interpret this restriction to also encompass specific forms of religious discrimination, particularly when such discrimination is rooted in a group's "actual or perceived" (i) shared ancestry or ethnic characteristics, or (ii) citizenship or residency in a country with a predominant religion or a distinct religious identity. Id.

Here, the Plaintiff has asserted that she was a practicing Muslim of Egyptian descent, which she alleges NYIT-COM perceived as interconnected religious and ethnic identities (AC ¶¶ 2, 6, 11, 26, 47, 128–131). She further contends that she was expelled and targeted in ways not experienced by non-Muslim, non-Middle Eastern students (id. ¶¶ 50–53, 109–112). These allegations, when viewed in the light most favorable to the Plaintiff, fall within the prohibited grounds recognized under Title VI; consequently, dismissal is not warranted. *TE v. Pine Bush Central School District,* 58 F. Supp. 3d 332 (SD NY 2014).

### 2.    The Amended Complaint Alleges That the Discrimination Was Deliberate.

The Amended Complaint delineates several instances of deliberate and disparate treatment, collectively providing a plausible basis to suggest that the Plaintiff's expulsion was motivated by discriminatory bias. Specifically, the Plaintiff highlights a pattern wherein other Muslim, Middle Eastern students at NYIT-COM (Egyptian, Pakistani, Syrian) were subjected to disproportionately severe disciplinary actions compared to their non-Muslim counterparts who are similarly situated (AC ¶¶ 50–53, 111–112).

Furthermore, the Magistrate's Report and Recommendation failed to consider that the Plaintiff was expelled for conduct, such as failing a clinical rotation, which allegedly did not result in dismissal for others, thereby contravening NYIT-COM's own handbook (AC ¶¶ 78–85). For example, a peer purportedly encouraged the Plaintiff to convert to Christianity and disparaged Islam as an "evil religion" (AC ¶ 57). Additionally, following her expulsion, the Plaintiff received a book from an Amazon-affiliated seller in Alabama, the book written by the congresswoman "Boebert," who is known for her Islamophobic remarks (AC ¶ 43). Moreover, the Plaintiff alleges that a faculty member reportedly

instructed her to "return to Egypt where you came from" (AC ¶ 104), an explicit expression of discriminatory intent based on national origin. Furthermore, School officials are alleged to have admitted that the decision to expel her originated from "higher authorities" and was allegedly necessary to safeguard the institution's reputation, thereby indicating a possible pretext for discriminatory motives (AC ¶¶ 41, 64, 106).

These facts plausibly allege that the Plaintiff's expulsion was not solely based on legitimate academic or conduct concerns, but rather was influenced, at least in part, by bias against her religious and national background. Consequently, as the Plaintiff has met her burden of proof, the motion to dismiss should be denied. Furthermore, it should not be overlooked that the Plaintiff was very close to graduating. Over the course of four years, the Plaintiff met all requirements for graduation and was two months away from completing her American degree at the time of her expulsion in March 2022. AC. ¶9-14. On March 22, 2022, the Plaintiff was dismissed from NYIT-COM after satisfying four years of medical graduation requirements. Id. Even if this is true, the penalty appears excessively severe.

### 3. Plaintiff Asserts That Her Religion and National Origin Served as Motivating Factors for the Adverse Action

Title VI mandates that discrimination constitute a "substantial or motivating factor" behind the defendant's conduct. *Alexander*, id. Plaintiff contends that she was performing adequately in her academic program and had fulfilled all graduation requirements prior to her sudden dismissal, which occurred two months before the anticipated graduation date (AC. ¶¶ 13–14, 78–80). Furthermore, she asserts that similarly situated non-Muslim students, who faced comparable or more severe conduct issues, were permitted to graduate (AC. ¶¶ 81–85, 97–99).

Most importantly, the Plaintiff explicitly associates the timing and substance of her disciplinary proceedings with her previous disclosures concerning discrimination within Southern residency programs and her perceived Middle Eastern and Muslim identity (AC. ¶¶ 47–49, 66, 106, 109). Her allegations, accepted as true at this stage, suggest a reasonable inference that her religion and national origin served as motivating factors in the decision to terminate her from the medical program.

**4.    The Plaintiff Was Dismissed for Minor Offenses, and It Is Evident That Her Dismissal Was Influenced by Discrimination and Retaliation**

Plaintiff has pleaded that at NYIT-COM, the majority of Muslim students pursuing surgical specialties of Middle Eastern descent encounter a higher incidence of disciplinary actions compared to other students, particularly female students from Pakistan, Syria, and Egypt.

Upon information and belief, students U., A.A., Y.A., M.A., S.A., and Y.E. have experienced disparate treatment attributable to their religious beliefs and Middle Eastern heritage. (AC ¶¶ 47 and 50). Christian students received more favorable treatment compared to Muslim Egyptian students. For instance, unlike the Plaintiff, M.A., Y.T., G.Y., M.A., and P.S. were supported in achieving their goals even when demonstrating lower academic progress. (AC ¶ 51) P.S. failed the UMSLE six times prior to his admission to NYIT-COM. Nonetheless, the institution assisted him in overcoming his difficulties, leading to his graduation and subsequent residency training. Conversely, the institution does not extend an equivalent level of leniency and support to Muslim students, as clearly evidenced by the Plaintiff's case. (AC ¶ 51) For example, in 2012, NYIT-COM expelled Middle Eastern Egyptian Muslim surgeon Ahdy Attallah. In 2020, NYIT-COM expelled Muslim Pakistani student S.S. despite his outstanding academic performance across all subjects. (AC ¶ 52)

In contrast, American non-Muslim medical students who engaged in egregious misconduct, including cheating on examinations, sexual harassment, or academic difficulties, were permitted to graduate. Conversely, Muslim students were subject to close surveillance and faced expulsion for infractions deemed less severe. A.S., one of the ambassadors at NYIT-COM, conveyed to the Plaintiff that the institution exhibited greater leniency towards other students relative to her. Student A.Z. was reported for sexual harassment; while NYIT-COM imposed disciplinary measures, he was not expelled. Student M.K. encountered academic challenges and failed the MTOM-813 course; however, he was provided remediation opportunities and subsequently graduated.

In this case, the Plaintiff was dismissed for minor violations during two clinical rotations, incidents that should not have resulted in expulsion. (AC ¶ 55-59). Dr. William Blazey, Vice Dean of NYIT-COM, made a concerning

15

statement: "NYIT-COM will not be able to graduate any more students if we do not expel this student," indicating a biased perspective. Although she did not have direct professional interaction with the Plaintiff, Dr. Catherine Caronia, serving as the Chief Academic Officer of the Catholic Health System and the chairman of the GME office at Good Sam Hospital, reported minor infractions to NYIT-COM's Dean, Dr. Wadsworth, including failure to return ID badges, absence on President's Day due to a medical emergency, and characterized her emails requesting letters of recommendation as stalking. The Catholic Health System also informed the Plaintiff that "the Plaintiff is not welcome on any of their rotation sites." (AC ¶ 61).

The Plaintiff was subsequently referred to an ethics committee for minor infractions, which resulted in an unjustified censure by the Vice President, Dr. Jerry Ballentine. (AC ¶ 68). These minor infractions did not indicate intentional disobedience or disregard for established protocols. The severe punishment for wrongful censure of these infractions resulted in the Plaintiff's expulsion and adversely affected her career. Such concerns could have been effectively addressed through counseling, guidance, and institutional support mechanisms rather than censure, which ultimately contributed to the Plaintiff's expulsion following Cedar Sinai's failure to pass her rotation. (AC ¶ 68)

Furthermore, the Plaintiff was subjected to less favorable treatment in comparison to Christian American classmates during the same rotation within the Catholic Health System. (AC ¶ 69) For example, in February 2018, during her clinical rotation in emergency medicine at St. Joseph Hospital of the Catholic Health System, a Christian American peer named "Anjalica" arrived late for her scheduled shift. However, the Chief Academic Officer of Catholic Health neither reported Anjalica to the Dean of NYIT-COM nor convened any ethical review meetings, in contrast to the treatment received by the Plaintiff. This discrepancy indicates discriminatory conduct within the Catholic Health System, which ultimately affected the Plaintiff's medical career. (AC ¶ 70)

Under typical circumstances, students experiencing difficulties during a rotation are duly informed of their weaknesses and are provided with remediation options to address these issues. However, in the case of the Plaintiff, such remediation was not offered, nor were any concerns regarding the Plaintiff's performance raised during the rotation. The

failure to remediate the Plaintiff's performance, without following the standard protocol, represents a deviation from the established procedure and the Due Process of the AAMC clinical evaluation process. According to standard protocol, a preceptor must initiate remediation procedures, document any identified weaknesses, and provide the student an opportunity to improve. Nonetheless, no remediation efforts were undertaken during the rotation; consequently, the preceptor had no basis to fail the student after her departure from the hospital.

The Plaintiff was expelled merely two months prior to graduation despite having fulfilled all graduation requirements. The reasons for expulsion included two clinical rotations, which were nonclinical and did not constitute significant infractions. Furthermore, the penalty imposed was grossly disproportionate to the offense according to NYIT-COM policy. (AC ¶ 80)

The Plaintiff's expulsion was unwarranted, particularly given that other students who failed rotations did not encounter comparable repercussions. Another classmate failed rotations yet was not expelled from NYIT-COM, which indicates differential treatment potentially based on the Plaintiff's religion and national origin. (AC ¶ 81). It is believed that NYIT-COM has exercised leniency towards other students, such as A.Z., who is non-Egyptian and non-Muslim; this individual was reported for sexual harassment and subjected to disciplinary measures, yet was not expelled by NYIT-COM. (AC ¶ 83). Additionally, Student H.W. was reported for academic misconduct, including cheating on an exam, and incurred academic delays due to failure to submit the COMLEX exam results on time. This student was treated leniently and not expelled. (AC ¶ 84)

Furthermore, the Dean of Admissions, Mr. Mary Ann Achtziger, falsely alleged that the Plaintiff provided misinformation on her medical school application. (AC ¶ 86) Regarding the unfounded accusation, the institution asserted that the admissions department was not informed of the Plaintiff's three-month residency in 2016. (AC ¶ 90). Nevertheless, the Plaintiff had disclosed her prior residency on seven separate occasions. (AC ¶ 91). Following the expulsion, a faculty member, Felecia Bruno of the Ethical Committee, directed a derogatory remark toward the Plaintiff, stating, "Return to 'Egypt' where you came from," thereby making a blatant ethnic slur that referenced the Plaintiff's

national origin and religion. (AC ¶ 104)

Based on information and belief, Muslim students were systematically assigned to non-hospital settings, office-based rotations, or hospitals lacking residency programs, which impaired their chances of securing desirable residency placements. In contrast, non-Muslim students were frequently assigned rotations in hospitals with established residency training programs, thereby providing greater exposure to networking opportunities and experience that could enhance match outcomes. This discrepancy resulted in lower match rates for Muslim students in competitive or categorical specialties. Muslim students, including Mohammad Yasin, Iffat Adeel, Tamzid Hassan, and Umme Romana, reportedly faced difficulties in securing categorical positions, often having to accept preliminary or transitional-year roles. Meanwhile, others, such as the Plaintiff and Anjum Kazi, did not match. (AC ¶ 109)

The plaintiff was scheduled to complete rotations at various facilities within the Catholic Health System, including St. Catherine of Siena for surgical practice, St. Joseph Hospital for emergency medicine, and Mercy Hospital for internal medicine; none of which offer residency programs. She asserts that this limitation impeded her ability to establish the professional connections necessary to secure a position in a categorical residency. (AC ¶ 110)

Therefore, in the present case, the amended complaint articulates facts that satisfy all elements necessary to establish a Title VI discrimination claim and provides specific examples illustrating how the Plaintiff's dismissal was attributable to discrimination and retaliation. The allegations are neither speculative nor conclusory; instead, they are detailed, specific, and supported by factual evidence. In accordance with the standards set forth in *Ashcroft v. Iqbal* and *Alexander v. Sandoval*, the complaint plausibly alleges that the Plaintiff was intentionally discriminated against based on religion and national origin, and that such discrimination was a motivating factor in her termination from NYIT-COM. Furthermore, all facts should be construed in the light most favorable to the Plaintiff. *Iqbal*, id.

Therefore, the Plaintiff has appropriately articulated a claim for relief pursuant to Title VI, and the objections to the Magistrate Judge's Report and Recommendation are upheld, resulting in the denial of the Defendant's Motion to Dismiss.

## POINT IV

### PLAINTIFF HAS ADEQUATELY PLEADED RETALIATION UNDER TITLE VI

In the case presently under consideration, the Plaintiff has articulated factual allegations that substantiate a credible claim for retaliation pursuant to Title VI, thereby meeting the standards established in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and aligning with the principles acknowledged in *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). As acknowledged by NYIT, "courts have generally construed [Title VI] as creating an implied private right of action for retaliation." See *Bloomberg v. New York City Dept. of Educ.*, 410 F. Supp. 3d 608, 624 (S.D.N.Y. 2019) (quoting *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013).

Under this framework, to establish a claim for retaliation, the plaintiff must assert (1) *protected activity* under Title VI; (2) *adverse action* by the defendant; and (3) a *causal link* between the protected activity and the adverse action. The plaintiff's allegations, when accepted as true and viewed in the most favorable light, fulfil all three criteria. Id.

### 1. Plaintiff Engaged in Protected Activity

The plaintiff's protected activity encompasses her prior complaints and legal actions concerning racial and national origin discrimination in residency programs in the Southern United States (AC ¶¶ 20–21, 28, 47–49). Furthermore, the plaintiff has voiced concerns and taken action against systemic bias targeting international medical graduates (IMGs), Muslims, and Middle Eastern students (AC ¶¶ 47–50, 111–112), including her inquiries and complaints directed to senior officials within the medical education sector, such as the ACGME, regarding unfair treatment (AC ¶¶ 6, 19, 29–30, 40). This conduct constitutes protected activity under Title VI, which protects against both direct discrimination and retaliation for opposing discriminatory practices. See *Bloomberg, et al., id.*

### 2. Plaintiff Suffered Adverse Action

In her Amended Complaint, the Plaintiff asserts that she was expelled from NYIT-COM two months prior to graduation—an unquestionably severe adverse action that terminated her eligibility for medical licensure in the United States, resulted in the loss of match opportunities across multiple residency cycles (AC ¶¶ 37, 113–116), led to public

defamation, including being labeled as "unprofessional" and accused of academic misconduct (AC ¶¶ 117–120), and caused financial, reputational, and emotional damages (AC ¶¶ 124–125, 133). The timing and circumstances of this expulsion, particularly in light of its occurrence after her protected speech, strongly suggest a retaliatory motive. See *Bloomberg, et al, id*.

Consequently, her allegations satisfy her obligation to resist a motion to dismiss.

**3.     The Complaint Pleads a Causal Connection**

The amended complaint presents numerous factual allegations establishing a causal connection between the Plaintiff's protected activity and the retaliatory actions of NYIT-COM. See *Bloomberg, et al, id.* Here, the disciplinary proceedings commenced immediately after the Plaintiff disclosed her prior expulsion and raised concerns regarding healthcare disparities impacting Muslim and Middle Eastern IMGs (¶¶ 47–48). Additionally, the Plaintiff was expelled following coordination among NYIT-COM and external entities, including the ACGME and Southern hospitals, which have vested interests in silencing her complaints (AC ¶¶ 28–30, 39–41). Furthermore, multiple mentors acknowledged that her dismissal originated from "higher authorities" allegedly retaliating against the Plaintiff for her previous lawsuits and advocacy (AC ¶ 41). NYIT-COM repeatedly offered the Plaintiff "deals" to quietly withdraw from the program (AC ¶¶ 38, 42), and upon her refusal, proceeded with her expulsion. Subsequently, the Plaintiff was barred from clinical rotations and deprived of institutional support (AC ¶¶ 113–116), resources she had previously utilized to advocate for marginalized IMGs.

These factual allegations, taken together, give rise to a plausible inference that the Plaintiff was expelled in retaliation for exposing discriminatory practices against Muslim and Middle Eastern IMGs.

Furthermore, the Defendant contends that the retaliation claim should be dismissed on the grounds that the Plaintiff did not explicitly categorize it as such and failed to articulate it with sufficient particularity. This contention is unpersuasive for several reasons. Firstly, in accordance with federal pleading standards, the Plaintiff is not obliged to specify every legal theory, provided that the facts underpin a valid claim. See *Johnson v. City of Shelby*, 574 U.S. 10, 11

(2014) (per curiam) ("Federal pleading rules call for a short and plain statement of the claim,' not an exposition of a legal theory).

Moreover, the Amended Complaint consistently references retaliation (e.g., AC ¶¶ 21, 28, 34, 40, 47) and provides detailed circumstances connecting the Plaintiff's protected activities to the timing of her expulsion. The Second Circuit has long recognized that retaliation claims under Title VI are actionable and that retaliatory acts can be plausibly inferred from the factual narrative. See *Blum v. Schlegel*, 18 F.3d 1005 (2d Cir. 1994); *Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192, 199 (W.D.N.Y. 2013).

Therefore, the Plaintiff has plausibly alleged that she engaged in protected activity by speaking out against discriminatory practices. She suffered adverse educational and professional consequences as a result, and there was a causal link between the two, as evidenced by the timing and coordinated actions of NYIT-COM and external actors. Accordingly, dismissal of the Title VI retaliation claim is unwarranted under the standards set forth in *Ashcroft v. Iqbal* and the facts alleged in the complaint. Therefore, this claim should be permitted to proceed.

Therefore, the Plaintiff has adequately established a claim for relief pursuant to Title VI, and the objections to the Magistrate Judge's Report and Recommendation are upheld, resulting in the denial of the Defendant's Motion to Dismiss.

## **CONCLUSION**

The Plaintiff respectfully requests that the Recommended Ruling and Decision be reversed, as it dismissed the Plaintiff's allegations of discrimination and retaliation. Consequently, the objections raised should be upheld, and the Defendant's Motion to Dismiss should be denied in its entirety.

**INTENTIONALLY LEFT BLANK**

Dated: New York, New York
      January 13, 2026

Respectfully submitted,

STEWART LEE KARLIN
LAW GROUP, P.C.

*/s/ Stewart Lee Karlin*
Stewart Lee Karlin, Esq.
*Attorney for Plaintiff*
111 John Street, 22nd Floor
New York, NY 10038
(212) 792-9670
slk@stewartkarlin.com

22